THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE ROJAS, Defendant-Appellant.

First District (1st Division)   No. 1—03—3196

Opinion filed August 15, 2005.

Steven Decker and Donald S. Honchell, both of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Jose Rojas, appeals from his convictions for first degree murder by personally discharging a firearm and first degree murder while armed with a firearm after a jury trial. He was tried with his codefendant Erik Ramirez before separate juries that were excused at those points necessary to protect them from duplicative or inadmissible testimony. He contends that the State failed to prove his identity as the shooter of Alberto Villagomez beyond a reasonable doubt. Defendant further contends that the circuit court erred in admitting testimony surrounding his alleged intimidation of a witness, and argues that his trial counsel was incompetent for failing to preserve the issue of the erroneous admission of his statements for review. Alternatively, he argues that if trial counsel opened the door for the introduction of the witness-intimidation testimony through his cross-examination of the witness, then counsel was incompetent for opening the door. Finally, defendant contends that trial counsel was incompetent in failing to move to suppress his arrest and the evidence obtained in the search of his car. We affirm.

## FACTUAL BACKGROUND

At defendant's trial, Rodolfo Guzman testified that he and his friend, the victim, Alberto Villagomez, spent time together starting around 6:30 p.m. on April 20, 2001. Guzman testified that both he and Villagomez were former members of the Two Six street gang. While together, the two drank beer. Later that night, they attended a party where they continued to drink as well as ingest "key shots" of cocaine, the amount that could be held on the end of a key. Guzman denied any intoxication from the cocaine, however.

Guzman explained that he and Villagomez left the party after midnight to get food. As they drove to a restaurant on Pulaski Street, a gray van pulled up alongside them. The side door of the van opened, and while the occupants of the van flashed gang symbols and screamed at them, someone threw a bottle at Villagomez' car, breaking one of its windows.

According to Guzman, Villagomez then drove his car into a gas station at 28th Street and Pulaski to clean up the broken glass inside the car. Once stopped, Guzman went to the gas station clerk to get change for the station's coin-operated vacuum. Guzman then went behind the gas station, to an alley, to urinate.

While in the alley, Guzman saw a white Suburban sport utility vehicle (SUV) approach. The front passenger made a Two Six gang sign with his hands. Guzman testified that, in order to avoid any trouble, he made the same sign back. At that point, the passenger

exited the SUV and he and Guzman exchanged words. When he saw a gun in the passenger's hand, Guzman started to run back across the gas station and shouted to Villagomez to flee as well. Guzman heard shots, turned around, and saw the SUV passenger shoot Villagomez. The gas station clerk testified to hearing a series of shots and, shortly thereafter, observing Villagomez enter the shop, clutching his stomach and asking for help, and then collapsing. According to a Cook County medical examiner, Villagomez was shot five times in the back, each shot subsequently exiting his body, and died from his wounds.

William Wright and Luis Cerritos testified that they were members of the Latin Kings street gang, like defendant. Both testified that the Latin Kings and Two Sixers were rivals. Wright and Cerritos were drinking with others in a garage in the late evening of April 20 and early morning of April 21 when defendant arrived in his white Suburban SUV, which had a broken window. Codefendant Ramirez, who was already at the garage, approached the SUV and had a conversation with defendant. Ramirez then got in the passenger side of the SUV and told Wright and Cerritos to get into the backseat, which they did.

Both Wright and Cerritos testified that defendant related that Two Sixers broke his window and that he wanted revenge. Defendant drove to the border of Latin King and Two Six territory. At that point, defendant and Ramirez changed seats and Ramirez drove the group into Two Six territory. As Ramirez drove the Suburban into an alley behind a gas station, they observed a young man standing behind the station. According to both Wright and Cerritos, defendant, though a Latin King, then flashed a Two Six hand symbol. When the man reciprocated with the same symbol, defendant chased after him with a gun he had retrieved from inside the Suburban's dashboard. Wright and Cerritos heard shots fired, and when defendant returned, they drove away. In the process of fleeing the area, Wright and Cerritos explained, a dark Cadillac chased them until defendant shot at that car.

Defendant's trial counsel attempted to discredit both Wright's and Cerritos' testimony by eliciting that both originally denied knowledge of the murder and only implicated defendant after the police informed them that they had been identified as being involved in the shooting. On redirect examination, to explain its witnesses' changing accounts of events, the State elicited from Cerritos that Latin Kings were instructed that they would be killed if they ever aided the prosecution of a fellow gang member, and elicited from Wright that defendant repeatedly told him not to "trick on him," meaning not to implicate him in the offense. This testimony on redirect was admitted over

defendant's trial counsel's objection that it exceeded the scope of his cross-examination.

Chicago police sergeant Lance Becvar testified about the events surrounding defendant's arrest. Becvar was on patrol on the morning of April 21, 2001, and heard a shot fired in the vicinity of 30th Street and Lawndale. Approximately five seconds later, a white Suburban SUV sped past his patrol car going between 10 to 20 miles over the speed limit. Becvar pulled his car behind the SUV and radioed that he was following a vehicle he believed to be involved in a shooting. Around 30th Street and Central Park Avenue, Becvar activated his police lights and pulled the SUV over. He identified defendant in court as the front-seat passenger and Ramirez as the driver.

Once backup arrived, all four occupants of the SUV were ordered out of the vehicle. Becvar searched the SUV and discovered a gun hidden behind the center air-conditioning duct in the dashboard. Later, police brought Guzman to the scene, where he identified defendant as the person who shot Villagomez.

Police evidence technicians recovered a bullet lodged in a van parked across the street from the gas station. Testing of the bullet revealed that it had been fired from the gun Becvar recovered from defendant's SUV. However, testing did not reveal defendant's fingerprints on the gun. Likewise, tests performed on defendant's hands were negative for the presence of gunshot residue, though a forensic scientist testified that his hands also failed to test positive for gunshot residue after he fired the gun once and explained that environmental factors, including wind, could produce negative results.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant first contends that the State failed to prove his guilt beyond a reasonable doubt since there was no physical evidence to tie him to the crime and the State's witnesses were wholly incredible in identifying him as the shooter. We disagree.

■ To determine whether sufficient evidence was presented to sustain a conviction, a reviewing court must consider all the evidence in the light most favorable to the State, and then determine if a rational trier of fact could have concluded that the State proved the elements of the crime charged beyond a reasonable doubt. *People v. Cox*, 195 Ill. 2d 378, 387 (2001). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Bush*, 214 Ill. 2d 318, 326 (2005). Although the determinations of the trier of fact are not conclusive, they are entitled to great deference, so that a conviction will only be overturned

where the evidence "is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). A reviewing court will not retry the defendant. *People v. Green*, 322 Ill. App. 3d 747, 754 (2001).

■ Specifically, with regard to defendant's identification by Guzman, a single witness identification of the accused as the person committing the crime may be sufficient proof when the witness viewed him under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). But, a conviction cannot stand when a witness' identification of the accused as the criminal perpetrator is vague and doubtful. *People v. Ash*, 102 Ill. 2d 485, 494 (1984). In *People v. Slim*, 127 Ill. 2d 302 (1989), our supreme court said that in assessing identification testimony we should use the following factors set out in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972): "(1) the opportunity the [witness] had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the [witness] at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-08. However, we should also consider all circumstantial facts to determine the sufficiency of the identification. *People v. Young*, 269 Ill. App. 3d 120, 123 (1994).

Defendant points out that Guzman never testified as to the exact amount of time he observed the gunman and contends that circumstances would suggest only a brief observance. He argues that the panic that occurred following Guzman's seeing the gun and his subsequent flight, with a focus on warning Villagomez, limited the degree of his attention on the shooter. He contends that Guzman's use of intoxicants precluded a sufficient identification. Further, he contends that Guzman's credibility surrounding the identification was impeached since Guzman testified to identifying defendant from the squad car in which he was brought to Central Park Avenue, while Wright testified that the witness was brought out of a squad car to make an identification. Finally, defendant argues that Guzman's identification was revealed to be "frail" by his impeachment by stipulated testimony that he told police that he and Villagomez had left the party to buy drugs, whereas he testified to leaving to buy food. While these are valid arguments for attacking an identification, we do not find them sufficient to render the identification vague and doubtful to the point where no rational jury could have credited Guzman's identification of defendant.

■ To begin, not all of Guzman's observation of the shooter oc-

curred while he was in a state of panic or flight. A fair inference, and, again, all reasonable inferences must be drawn in favor of the State on review (*Bush*, 214 Ill. 2d at 326), is that Guzman had sufficient opportunity and attention to identify defendant while he flashed the Two Six gang sign and during their exchange of words, moments at which defendant did not yet appear as an actual threat to his life. Moreover, it is also reasonable to infer that defendant was put before Guzman for identification only a short time after his initial observation. Defendant was arrested close to the murder scene, while he fled from that scene. Sergeant Becvar testified that Guzman was brought to the arrest scene only 15 minutes after he stopped the SUV. Finally, though he admitted ingesting cocaine, Guzman testified to feeling no effect from the small amounts he claimed to have taken. These facts and inferences reasonably allow the conclusion that Guzman's identification of defendant as the shooter was legally adequate.

Regarding Guzman's supposed impeachment, we note that "it is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. It is also for the trier of fact to resolve conflicts or inconsistencies in the evidence. [Citations.]" *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Therefore, we will not "substitute [our] judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses." *Tenney*, 205 Ill. 2d at 428. Nor will we reverse a conviction " ' "simply because the defendant tells us that a witness was not credible." ' [Citation.]" *Tenney*, 205 Ill. 2d at 428. The arguments made before this court were also made to the jury below and we, therefore, will not usurp its role in determining whether they raised a reasonable doubt. See *Tenney*, 205 Ill. 2d at 428-29 ("the jury was fully aware of [the witness' testimony's] alleged infirmities. *** It was the jury's function to draw conclusions based on the evidence and to decide whether there was a reasonable doubt as to defendant's guilt").

■ These same considerations apply to defendant's challenges to the testimony of Wright and Cerritos. It is true that the two could not agree as to at which beach they and friends had spent the day before going to the garage where they met defendant, Wright claiming the beach at 95th Street, Cerritos stating the beach adjacent to Navy Pier. Also both admitted to drinking throughout the day leading up to when they joined defendant in his SUV. The two were inconsistent as to the identification procedure used by the police. Moreover, both initially denied knowledge of the murder. However, as before, these factors were put before the jury for its consideration and it was unpersuaded. See *Tenney*, 205 Ill. 2d at 428-29 ("the jury was fully aware of [the

witness' testimony's] alleged infirmities. \*\*\* It was the jury's function to draw conclusions based on the evidence and to decide whether there was a reasonable doubt as to defendant's guilt").

Defendant nevertheless stresses that accomplice testimony is always suspect, a fact acknowledged by the trial court when it issued a cautionary instruction regarding such testimony. Defendant therefore contends that Wright's and Cerritos' testimony could, therefore, not suffice to sustain the conviction. However, as stated in *Tenney*, "the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt." *Tenney*, 205 Ill. 2d at 429. Moreover, here their testimony surrounding the actual execution of the murder was explicitly corroborated by Guzman. We therefore find sufficient evidence for defendant's conviction to stand.

## II. Introduction of Witness-Intimidation Evidence

Defendant next contends that the trial court erred in admitting Wright's testimony on redirect examination that defendant sought to intimidate him into not cooperating with the police by telling him not to "trick." He appears to argue, initially, that the court should have stood by a ruling that Wright's testimony was inadmissible on account of its nondisclosure in discovery. He further argues that the trial court erroneously concluded that the testimony, which would otherwise have gone beyond the scope of cross-examination, became admissible through trial counsel "opening the door" through his cross-examination. Finally, defendant contends that admission of Wright's testimony was particularly prejudicial because the State used defendant's testimony as proof of consciousness of guilt. We disagree.

■ We may quickly dispose of defendant's first argument because, as a matter of fact, defendant's statements were never excluded by the trial court for a discovery violation. The record discloses that trial counsel for defendant acknowledged receipt of Wright's grand jury testimony, which contained Wright's account of defendant's intimidating statements, on June 27, 2001, during discovery, and almost two years prior to defendant's trial. Rather, it was the intimidating statements allegedly made by Ramirez to Wright that were excluded for nondisclosure in discovery when the State informed Ramirez's counsel of their existence only on the day preceding trial. The colloquy which defendant contends supports his interpretation of the trial court's ruling actually makes the distinction between the court's treatment of defendant's statements and Ramirez's statements explicit.

"MS. KAZAGLIS [Assistant State's Attorney]: [*Mr. Wright*] *did*

*tell me that Mr. Ramirez when they were in the lockup also told him not to say anything in addition to Mr. Rojas. \*\*\* [T]hat statement of Mr. Ramirez I don't intend to elicit on direct of this witness.*

MR. COHEN [counsel for Ramirez]: Your Honor, I would ask that it not be elicited on direct or cross.

THE COURT: What?

MR. COHEN: The last one, that my client somehow intimidated Mr. Wright to not say anything. This is the first time I've heard of it in what, almost two years.

THE COURT: When did that occur?

MS. KAZAGLIS: Judge, according to Mr. Wright, that occurred at the time he was in the 10th District lockup. He and Mr. Serritos [*sic*] were in one cell, Mr. Rojas and Mr. Ramirez were in another cell. *I have already tendered to both counsels statements that Mr. Rojas made regarding his intimidation, his statements to be quiet. Mr. Wright today told me, although I have spoken to him before, that Mr. Ramirez in addition said don't say nothing [sic].*

MR. COHEN: Well, I think that goes to his credibility. But clearly I haven't heard about that for two years since the date of arrest and I think it's improper.

THE COURT: *Is that statement contained in any discovery that's been tendered?*

MS. KAZAGLIS: *No, judge, I'm stating it today for the first time.*

THE COURT: Then it will not be admitted." (Emphasis added.)

Clearly, the above colloquy only addresses Ramirez's statements, not those of defendant which the State previously disclosed.

■ With respect to defendant's second argument, that the State's elicitation from Wright on redirect examination of defendant's intimidating statements to Wright went beyond the scope of cross-examination, we note, and defendant concedes, that he has waived review of this contention by failing to challenge the admission of the statements in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (holding that a trial objection and a challenge in a written posttrial motion are necessary to preserve an error for plenary review). However, defendant claims to be entitled to a review of his contention under the plain error doctrine. We disagree.

Supreme Court Rule 615 allows us to notice "[p]lain errors or defects affecting substantial rights \*\*\* although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). However, this review is restricted to "two limited circumstances": first, where the evidence is closely balanced; second, where the waived errors "are of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the errors is necessary to preserve the integrity of the judicial process." *People v. Vargas*, 174 Ill. 2d 355, 363 (1996).

As to the first circumstance, as we suggested in our review of defendant's sufficiency of the evidence challenge, we do not perceive the evidence in this case to be close. Guzman presented strong identification testimony against defendant, and Cerritos presented an account of events incriminating defendant that substantially interlocked with Wright's account. In light of this evidence, we cannot see defendant avoiding his conviction even with the removal of the witness-intimidation evidence.

Regarding the second circumstance under which plain error may be recognized, we must first determine if any error occurred. *People v. Richmond*, 341 Ill. App. 3d 39, 47 (2003). Only after finding an error by the court below should a reviewing court determine if the error was of such magnitude that remedying the error " 'is necessary to preserve the integrity of the judicial process.' " *Richmond*, 341 Ill. App. 3d at 47, quoting *Vargas*, 174 Ill. 2d at 363. Applying this review to defendant's case, we find no error by the trial court.

As defendant admits, the admission of evidence is left to the sound discretion of the trial court (*People v. Kirkman*, 241 Ill. App. 3d 959, 964 (1993)), as is the scope of redirect examination (*People v. Araujo*, 261 Ill. App. 3d 393, 396 (1994)). "Where discretion has been vested in the trial court, only a clear abuse of discretion or an application of impermissible legal criteria justifies reversal." *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993). To abuse its discretion, a court must do more than merely exercise its discretion "unwisely." See *Anderson v. Anchor Organization for Health Maintenance*, 274 Ill. App. 3d 1001, 1007 (1995) ("As in any appeal from a discretionary ruling, our function on review is not to determine if the trial court wisely exercised its discretion, but only to determine if that discretion was abused"). A court only abuses its discretion when it "act[s] arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed[s] the bounds of reason and ignore[s] recognized principles of law" (*In re Marriage of Aud*, 142 Ill. App. 3d 320, 326 (1986)), so that "no reasonable person would take the view adopted by it" (*Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 70 (1998)). Here, we find no abuse of discretion.

On cross-examination, defense counsel elicited that Wright originally, before implicating defendant in the murder, told a detective that he fell asleep in the SUV, apparently suggesting that he slept through the pertinent events of the evening. Defense counsel further elicited that Wright was concerned that he would be charged in the murder and that he only implicated defendant after detectives told him that he had been "identified." While Wright denied it, defense counsel also suggested twice that police told him to "think about help-

ing himself." It was after this cross-examination that the State sought to elicit defendant's statements to Wright to "not trick." Defense counsel immediately objected. The following colloquy then ensued:

"MR. BEUKE [defense counsel]: Judge, I was very careful to stay away from any cross-examination remotely close to him being handcuffed with Rojas and any conversations. I didn't go into any of that.

MS. KAZAGLIS: There was the implication, not just the implication, but the question specifically asked of this witness of what he said originally and why he said it. And there was the implication the only reason he said something was based on what the police told him.

There has been evidence linking in discovery, and counsel is well aware that Mr. Rojas made threats to him, told him to be quiet during the time he was cuffed with him.

He was asked specifically about gang membership, involvement, how he knows Mr. Rojas. It certainly goes to why he would change his story; say one thing to the police and say something different. I think it's proper on cross-examination.

THE COURT: I agree. Even though you didn't specifically question him about the fact that they were cuffed together, you raised the implication in your cross-examination that he didn't tell this story to the police because he was afraid of being charged."

Following further arguments, the trial court made its final ruling on the subject, stating:

"On cross examination you, Mr. Beuke, raised the inference that the reason that Mr. Wright gave what he calls the truthful statement [implicating defendant] is because he was told by the police that he was implicated in this offense and that he was identified. And that is certainly a reasonable inference.

It is just as reasonable an inference, however, that the reason that he initially gave false statements was because of threats from Rojas.

Therefore the State will be permitted to bring that out and you can both argue your respective theories."

The State then elicited from Wright that defendant told him, while in the police car that would take them to a police station, while shackled next to him on a bench at a police station, and while in an adjacent holding cell, not to "trick," meaning not to say anything against him.

We find that the trial court was correct in determining that defendant's intimidating statements were admissible for the purpose of explaining why Wright made a prior statement inconsistent with his later account implicating defendant. As a general rule, when a witness makes a prior inconsistent statement, he should be allowed to

explain why he made that statement, and this is properly done on redirect examination. See *People v. Hicks*, 28 Ill. 2d 457, 462 (1963) ("[t]he rule in such cases is that when proof is introduced that a witness has made prior inconsistent statements, the witness should be afforded an opportunity of explaining these statements and showing the circumstances under which they were made"); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 613.3, at 573 (7th ed. 1999) ("[t]he cross-examiner does not herself have to provide the witness the opportunity to correct or explain; the opportunity for the witness to correct or explain the apparent inconsistency on redirect examination suffices"); 2 J. Wigmore, Evidence § 1043, at 500-01 (2d ed. 1923). More specifically, this court has held that intimidation of a witness by a defendant may serve to explain why a witness initially gave a statement that did not implicate a defendant. See *People v. Thigpen*, 306 Ill. App. 3d 29, 39 (1999) ("testimony that witnesses were made to fear for their safety if they testified against a defendant may be admitted to explain inconsistent statements by the witnesses"); *People v. Williams*, 262 Ill. App. 3d 734, 743 (1994) ("Once Antoine [a State witness] and his family had been threatened [by a friend of the defendant], Antoine had motivation to give a version of the events that did not implicate defendant or [his codefendant]"). Here, defendant's intimidating statements could have legitimately served to suggest that Wright originally lied about being asleep out of fear of defendant's retaliation should he have told the truth, thereby explaining his earlier evasive answer. See also *People v. Pursley*, 284 Ill. App. 3d 597, 604-05 (1996) (upholding the introduction of intimidating statements on redirect examination to explain why a witness delayed implicating the defendant and to counter inferences raised on cross-examination that the witness had only implicated the defendant for reward money and leniency in his own criminal proceedings); *People v. Coleman*, 223 Ill. App. 3d 975, 998-99 (1991) (otherwise approving of the use of redirect examination to explain why a witness did not initially implicate a defendant); *People v. Groleau*, 156 Ill. App. 3d 742, 750-51 (1987) (reversing for a new trial when a defendant was not allowed to use redirect examination to rebut the inference raised on cross-examination that a witness recently fabricated his testimony).

While defendant contends that the inconsistency was never elicited through his cross-examination, we find this contention to be yet another misreading of the record by defendant. As we noted above, defense counsel elicited on cross-examination that Wright first told the police that he was asleep while he was with defendant. Thus, there was no error in allowing evidence of defendant's intimidating statements to Wright to explain the prior inconsistent statement.

Further, even if defendant had not opened the door to the introduction of the intimidating statements, so that such evidence would have been beyond the scope of cross-examination, we would still not find reversible error. "While ordinarily the re-examination of a witness by the counsel producing him should be confined to matters called out on cross-examination, it is clearly within the discretion of the court to permit questions to be put to him touching new matters, and the exercise of such discretion will not ordinarily be reviewed on appeal." *City of Springfield v. Dalby*, 139 Ill. 34, 38 (1891); accord *Myers v. Arnold*, 83 Ill. App. 3d 1, 8 (1980) (citing *Dalby*). In finding no abuse of discretion on the part of the trial court, the *Dalby* court observed that the new matter introduced on redirect "was not of itself objectionable" and had "a direct bearing" on a question in the case. *Dalby*, 139 Ill. at 38; *cf. Myers*, 83 Ill. App. 3d at 8 (holding exclusion of new matter on redirect proper where the proffered matter "was of marginal relevance" and redundant of other witnesses' testimony). Here, as in *Dalby*, aside from its relevance to explain the prior inconsistent statement, as discussed above, the evidence of the defendant's intimidating statements was otherwise admissible and relevant as proof of defendant's consciousness of guilt. See *People v. Gambony*, 402 Ill. 74, 80 (1948) ("Any attempt by a party to a suit, either civil or criminal, to conceal or, by threats or otherwise, to suppress evidence or obstruct an investigation of an issue, is relevant upon the trial of such issue. In a criminal prosecution any attempted intimidation of a witness is properly attributable to a consciousness of guilt, and testimony relating thereto is relevant and admissible in evidence"). Moreover, this evidence, if actually used substantively, was still introduced in the State's case in chief, where it otherwise belonged, and defendant was given every opportunity to re-cross after redirect so that his confrontation rights were not diminished. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.12, at 521 (7th ed. 1999) ("the trial judge has discretion to permit the development of new matters [on redirect] [citations], subject, of course, to allowance of appropriate recross-examination thereon [citation]"). Therefore, though the better procedure is still to prohibit new matter on redirect examination and, instead, to allow the later recalling of a witness (2 R. Hunter, Trial Handbook for Illinois Lawyers—Criminal § 51:1, at 2 (8th ed. 2002)), there would have been no abuse of discretion in the statements' admission, even as new matter on redirect, and we must thus reject defendant's argument that he was improperly prejudiced were such evidence considered as demonstrating his consciousness of guilt.

Since there was no abuse of discretion by the trial court in admitting the evidence of defendant's intimidating statements to Wright,

there was no error and defendant's claim must fail under any standard of review. For this reason, defendant's claim that his counsel was ineffective for failing to preserve the error must also fail.

Finally, even if we were to find that the admission of Wright's testimony surrounding defendant's intimidating statements was erroneous, we would not find that error to be of such magnitude that a new trial would be necessary to preserve the integrity of the judicial process, as required for reversal under plain error review. As we discussed previously, the evidence against defendant was otherwise overwhelming. Moreover, Cerritos testified on direct examination that Latin King gang members were instructed that they would be killed if they testified against their fellow gang members. Wright also admitted to being a Latin King. Therefore, a separate indicator of Wright's intimidation, offering an explanation as to why he would have initially hesitated to implicate defendant, was also properly before the jury, lessening the significance of defendant's specific attempts to silence Wright. See *United States v. Abel*, 469 U.S. 45, 83 L. Ed. 2d 450, 105 S. Ct. 465 (1984) (holding membership in the same gang, whose tenets included committing perjury for the benefit of other members, between a defendant and a witness to be probative of bias and relevant to explain why a witness' testimony could be slanted in favor of the defendant).

### III. Ineffective Assistance of Counsel: Opening the Door to Introduction of Witness-Intimidation Evidence

■ Defendant next contends that he received ineffective assistance of counsel if his trial attorney opened the door to the introduction of the witness-intimidation evidence. We disagree since we find neither unreasonable representation nor any outcome-determinative prejudice to defendant.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney committed such serious errors as to fall beyond an objective standard of reasonableness and that, without those objectively unreasonable errors, there was a reasonable probability that his trial would have resulted differently. *Strickland v. Washington*, 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). A reasonable probability that a defendant's trial would have resulted differently without attorney errors ''is a probability sufficient to undermine confidence in the outcome.'' *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

In reviewing an attorney's actions, we will show deference to the attorney's decisions since there is a strong presumption that an at-

torney's actions fall within the wide range of choices that could be considered adequate counsel. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. Mistakes in strategy or tactics do not, alone, amount to ineffective assistance of counsel, nor does the fact that another attorney might have handled things differently. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994).

Defendant argues that defense counsel was incompetent in eliciting inconsistent statements from Wright because those inconsistent statements led to the introduction of defendant's intimidating statements to Wright. We note that this argument is somewhat at odds with that set forth in defendant's sufficiency-of-the-evidence challenge, where he stressed that "conflicts and impeachment have been recognized by courts of review as weaknesses in the credibility of trial witnesses' testimony." In fact, we think that defendant would have wanted to impeach Wright to the maximum extent possible in light of the damning nature of his account of the events on the day of the murder, which also interlocked with the account of Cerritos. Defendant does not even attempt to suggest what other actions trial counsel might have taken to discredit Wright's identification of defendant as the shooter without raising his prior inconsistent statements or suggesting police coercion. Likewise, defendant makes no argument explaining why the State's counterevidence of the intimidating statements was more prejudicial than the elicitation of the prior inconsistent statements and inference of coercion were helpful. Therefore, there appears to be no basis on which to find trial counsel incompetent.

Further, there appears to be no basis on which to find prejudice to the defendant. As we explained before, Guzman's testimony, along with the substantially interlocking testimony of Wright and Cerritos, was powerful evidence against defendant. Defendant makes no effort, however, to show how the witness-intimidation statements were so crucial, even in light of the three witnesses' accounts of the murder, that a different trial outcome would reasonably have occurred had defendant's statements been excluded. Instead, defendant merely states in conclusory fashion:

> "By his questioning of witness Wright, defense counsel permitted the State to offer and then utilize harmful statements of defendant it had previously been prohibited from using. As a result, the State could rely for additional proof on remarks made by defendant himself. In this way counsel created a trial in which confidence in the reliability of the outcome is lacking. Therefore, defendant was prejudiced by counsel's ineffectiveness."

This argument is insufficient to establish the requisite prejudice under *Strickland*.

## IV. Ineffective Assistance of Counsel: Failure to File a Motion to Suppress

■ Defendant's final contention is that his trial counsel was ineffective for failing to file a motion to suppress the introduction of the handgun discovered in defendant's SUV and the accompanying bullet cartridge casings. To establish ineffective assistance of counsel in the context of unfiled motions, a defendant must show a reasonable probability that the motion would have been granted and impacted the trial result. *People v. Spann*, 332 Ill. App. 3d 425, 432-33 (2002). We find no such showing here.

Defendant argues that a motion to suppress should have been filed challenging Sergeant Becvar's stop of defendant's SUV because he did not even have reasonable suspicion of wrongdoing so as to justify an investigative stop. He claims "no facts or inferences *** existed which would cause a reasonable officer to suspect an occupant's commission of a crime." We disagree.

"In appropriate circumstances *** a police officer may approach [citizens] for purposes of investigating possible criminal behavior even without probable cause for arrest, provided that the officer's decision to stop is based on specific and articulable facts which, when taken with rational inferences from those facts, reasonably warrant the investigative intrusion." *People v. Starks*, 190 Ill. App. 3d 503, 506 (1989), citing *Terry v. Ohio*, 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80 (1968). While defendant concedes that Becvar could have had a reasonable suspicion that the driver of defendant's SUV committed the traffic offense of speeding, he notes that stops for traffic offenses, without more, do not allow for searches of suspects' vehicles. See *People v. Corral*, 147 Ill. App. 3d 668 (1986). He therefore contends that Becvar's search of defendant's SUV was illegal. We, however, find that the facts and circumstances allowed Becvar to form the suspicion he claimed in his testimony, namely, that the SUV was involved in a shooting, and that that reasonable suspicion made a search of the SUV for weapons a permissible safety precaution.

Two Illinois courts have held that police officers may form a reasonable suspicion that individuals were involved in shootings when police observe those individuals in the area in which shots were fired. For example, our supreme court in *People v. Lee*, 48 Ill. 2d 272 (1971), held that police officers had a reasonable suspicion that a group of youths walking from the direction in which the police heard gunfire from pistols and shotguns were involved in the shooting and therefore upheld an investigative stop, including a patdown search for weapons. Similarly, in *People v. Basiak*, 50 Ill. App. 3d 155 (1977), the appellate

court held that police had a reasonable suspicion that individuals were involved in a shooting when they discovered those individuals at the site from which the officers heard the shots fired. See also *People v. Sanford*, 34 Ill. App. 3d 990 (1976) (police had reasonable suspicion to stop individuals driving away from the area of a known crime over the speed limit).

Moreover, numerous courts throughout the nation have upheld stops to investigate shootings based on nearly identical facts to the case at bar, where a car was observed speeding from an area where police heard shots fired. For example, the Tenth Circuit Court of Appeals held in *United States v. Henning*, 906 F.2d 1392, 1396 (10th Cir. 1990), that "trained law enforcement officers could not reasonably be expected to simply stand by and ignore the potential significance" of an SUV emerging from an area where police heard shots fired, making a short stop at a stop sign, and then driving away above the posted speed limit. Likewise, the Iowa Supreme Court in *State v. Melohn*, 516 N.W.2d 24, 25 (Iowa 1994), found police to have reasonable suspicion that an occupant of a car was involved in a shooting when "the sound of gunfire [was] quickly followed by *** observation of a vehicle racing away from the scene." Finally, the Texas Court of Appeals held in *Faulkner v. State*, 727 S.W.2d 793, 796 (Tex. App. 1987), that, when a police officer heard gunshots, saw a truck make a quick U-turn in the area where the shots were fired, and saw no one else in the area:

> "[T]hese facts were sufficient, standing alone, to constitute 'specific, articulable facts, which in light of [the officer's] experience and general knowledge, together with reasonable inferences from those facts, would reasonably warrant the intrusion on [appellant's] freedom' for the limited purpose of ascertaining his involvement in what could have been any number of possible offenses (i.e. disorderly conduct, trespassing, illegal discharge of a firearm, illegal possession of a weapon, or any number of assaultive offenses). [Citations.]"

See also *Commonwealth v. Bryant*, 866 A.2d 1143 (Pa. Super. 2005); *State v. Brown*, 232 Neb. 224, 439 N.W.2d 792 (1989); *People v. Payton*, 166 Mich. App. 428, 421 N.W.2d 191 (1988) (all finding reasonable suspicion existed for a stop to investigate shootings when suspects were observed fleeing on foot or otherwise attempting to flee from an area where the police heard shots fired).

Here, Sergeant Becvar testified that he observed defendant's SUV approach him, coming from the area in which he heard a gunshot emanate, over 10 miles above the speed limit in an area that was

known for gang disturbances.[1] Thus, there was a sufficient basis for a *Terry* stop of defendant's SUV to investigate the shooting, and any motion to suppress based on a lack of reasonable suspicion would have had no reasonable chance of success. Therefore, defendant could not have been prejudiced by trial counsel's failure to file such a motion.

Defendant still contends, however, that, even in the event of a valid stop of defendant's SUV, the search of the vehicle that followed

---

[1] Defendant argues that the evidence showed that defendant's SUV actually proceeded toward the direction of the gunshots based on Becvar's affirmative answer to his codefendant's counsel's question: "When the car went by you going westbound, it then made a right turn onto Central Park going southbound, correct?" However, previously, consistently, under both direct and cross-examination, Becvar testified that his squad car was located in an alley across 30th Street between Millard and Central Park facing southbound, and that he followed the SUV in his car onto Central Park from 30th Street after hearing a shot originate from the area of 30th and Lawndale. Taking judicial notice of the location of these streets, as we may (see *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177-78 (2003) (" 'Courts often take judicial cognizance of the distances between two or more locations *** and the customary routes and usual time required for travel between them.' [Citation.]"); *Commonwealth v. Grinkley*, 44 Mass. App. 62, 69 n.9, 688 N.E.2d 458, 464 n.9 (1997)), by this account, the SUV was proceeding east, since Central Park is east of Millard. Further, as demonstrated by the accompanying diagram, again taking notice of common geographical knowledge, it is impossible to take a right turn to go south if originally proceeding west; a southbound turn while facing west would be to the left. Therefore, defense counsel's question was internally contradictory, distorting its underlying premise since it posited a geographically impossible maneuver. In any event, it was the function of the jury to resolve any conflicts or inconsistencies in this testimony. *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

1 Sgt. Becvar's approximate position prior to the approach of the SUV
2 Approximate location of Sgt. Becvar's stop of the SUV

went beyond the applicable constitutional parameters. The State counters that Becvar's search of the car was constitutionally permissible as a protective search for weapons. We agree with the State.

In support of its argument, the State cites to *Starks*. There, police stopped a car after noting the similarity in appearance between a passenger in the car and a victim's description of an armed robber. That passenger and three other occupants were ordered out of the car at gunpoint and handcuffed. An officer then searched the car and discovered a handgun. *Starks*, 190 Ill. App. 3d at 505-06. The *Starks* defendant asserted that he was arrested without probable cause, but the appellate court held that he was, nevertheless, properly subjected to an investigative stop based on the officers' reasonable suspicion of his commission of a crime. *Starks*, 190 Ill. App. 3d at 508. Within that investigative stop, the *Starks* court held that the police were justified in ensuring their own safety by searching the car for weapons since they had reason to believe that the passenger was armed. *Starks*, 190 Ill. App. 3d at 509. See also *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983); *People v. Kelly*, 134 Ill. App. 3d 732, 739 (1985) ("Similarly, the search of the passenger compartment of defendant's car [during an investigative stop] was justified as a protective search for weapons since the officers knew that the robber had used a shotgun and had taken a pistol from [the victim]. The search was necessary to protect not only the police, but also the victim, who was nearby and would be brought to make an identification").

We find *Starks* to be persuasive in this case. Here, Sergeant Becvar had reason to believe that at least one occupant of the Suburban was armed since he observed it speeding from the area where he heard a shot fired. See also *Melohn*, 516 N.W.2d at 25 ("having heard shots, it was reasonable to conclude that the person or persons in the vehicle may have been armed and dangerous"). Therefore, he was justified in ensuring, for the protection of himself, his fellow officers, and Guzman, who would shortly be brought to the scene, that any possible weapons in the SUV were secured. Thus, again, a motion to suppress could not have been successful and trial counsel was not ineffective for failing to make such a challenge.

For all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

CAHILL, P.J., and O'MALLEY, J., concur.