NOTICE

Decision filed 03/29/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200200-U

NO. 5-20-0200

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE CITY OF HERRIN, an Illinois Municipal Corporation, | ) ) ) | Appeal from the Circuit Court of Williamson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-MR-239 |
| JOSH HORNER, UNKNOWN OWNERS, and NONRECORD CLAIMANTS, | ) ) ) ) | |
| Defendants | ) ) | Honorable Jeffrey A. Goffinet, |
| (Josh Horner, Defendant-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial court's grant of demolition order to plaintiff was against the manifest weight of the evidence where the trial court failed to establish the actual cost of repair and the basis of plaintiff's evidence was insufficient to support its claim that the buildings were beyond reasonable repair.

¶ 2    Defendant, Josh Horner, appeals the circuit court's order authorizing the City of Herrin (City) to demolish defendant's buildings pursuant to section 11-31-1(a) of the Illinois Municipal Code (Code) (65 ILCS 5/11-31-1(a) (West 2018)). On appeal, Horner contends the trial court's order was in error because the circuit court failed to establish the cost of repair, rendering the

1

court's subsequent conclusions, that the buildings were beyond reasonable repair and should be demolished, against the manifest weight of the evidence. For the following reasons, we reverse.

¶ 3                                     I. Background

¶ 4     On June 21, 2019, the City mailed notice to Horner demanding he repair or demolish, within 15 days, two buildings, comprised of a two-story house and detached garage, located on his property at 1212 W. Tyler Street in Herrin, Illinois. Sixteen days later, on July 9, 2019, the City filed a complaint seeking authorization, pursuant to section 11-31-1 of the Code, to demolish the two structures.

¶ 5     On August 28, 2019, at the City's request, Christopher Whiting and Steven Sims, a structural engineer and licensed architect, respectively, inspected the property. Whiting prepared a report dated September 4, 2019, listing the structural issues found in regard to the buildings. Sims issued a report on September 23, 2019, providing an architectural and mechanical assessment of the buildings. Sims also prepared an estimate, based on both reports, stating the cost to bring the buildings up to code was $63,197.

¶ 6     The case proceeded to a bench trial on January 8, 2020. The City and Horner stipulated that the property's value was $69,030, based on the most recent property tax bill.

¶ 7     Robert Craig, the Herrin code administrator, testified that he prepared the notice issued to Horner after receiving complaints and personally viewing the subject property. He was familiar with the definitions of "dangerous buildings" contained within the City's ordinance[1] and opined that Horner's property met all four definitions found therein. Craig further testified that he was familiar with section 5-2-9 of the ordinance[2] which addressed Herrin's fire limits. Craig opined,

_____

[1]Rev. Code of Ordinances of Herrin, Illinois, Art. II, § 5-2-6 (2018).

[2]Rev. Code of Ordinances of Herrin, Illinois, Art. II, § 5-2-9 (2018).

under this ordinance, the subject property "should be demolished," because it had "been damaged by decay or other causes to an extent greater than 50 percent of its value." He agreed no other options were available stating, "I don't believe repairing it would be an option *** demolish, I believe is the only option that we have available at this time."

¶ 8      Sims testified about the deficiencies he found with the buildings and opined the property met three of the four Herrin ordinance definitions of a dangerous building. After discussing the interior and exterior issues, Sims confirmed that his cost estimate represented all of the necessary repairs to bring the property up to code. He estimated it would take two to three months to obtain the bids and perform the necessary repairs. He further opined that bringing the building up to code and making it safe would cost more than $35,000. His opinion was based on the required repairs and alterations to meet code, the cost of materials, and use of a prevailing wage rate for labor. Sims conceded he did not contact any private contractors to estimate the costs and that his estimate was based on "prevailing wage" rates for labor. He agreed the amount of labor would be less if the owner fixed it himself and that a lot of the estimate cost was labor. He agreed the building could be repaired and confirmed that, if the repairs were made, the building could be occupied.

¶ 9      Whiting testified about the structural deficiencies found on the property and opined that bringing the property up to structural code would cost more than $35,000. He agreed that he did not advise that the property should be demolished. With regard to the garage, Whiting stated he did not know if the cost to repair the garage was more than the cost of demolition because he did not run those numbers.

¶ 10     Horner testified that he prepared an estimate based on the deficiencies found by Whiting and Sims. His estimate was based on repairing the property himself unless something was above his skill level. In those instances, he planned to rely on friends knowledgeable in construction or

3

hire contractors. Horner admitted he did not have experience repairing all the items that needed repaired and that he did not have any certificates, specialties, or licensure in structural engineering. His estimate included only the cost of materials, which overestimated the necessary materials, and conversations with other people who worked at Casey Rental, including Jerry Borum, who was a construction contractor for 30 years, and Ed Bachelor, who worked at Casey Rentals a long time. Horner stated he did not know the extent of the items that needed fixed until he received a copy of the City's inspection in October 2019. Horner could "get started immediately" performing repairs and would also request help from his brother who is in the business and people from Casey Rentals. He could do repairs on the weekends and occasionally during the day. His estimate did not include labor because those people were friends and family.

¶ 11    Jerry Borum, who performed residential and commercial contracting for 36 years, personally inspected the property and reviewed the City's reports and cost estimate. He explained that prevailing wages were for government or state level jobs and confirmed he would not charge Horner for labor; the cost was solely for materials. Borum believed the City's costs were exaggerated and addressed the discrepancies. For example, he disagreed that the entire roof needed to be demolished and replaced because only a two-foot square portion needed repaired. The remainder of the roof was solid. That cost, along with the insulation board and new decking, would be between $600 and $700. He agreed that some of the flooring needed replaced but stated the subfloors were fine. He believed that $3562 to repair drywall, mud, tape, sand and paint holes was a little excessive and opined those repairs could be accomplished for $400. He also disagreed that $1739 was required to sand and repaint the windows and exterior doors. Borum believed the repairs could be accomplished for between $24,000 and $25,000 and classified the City's $63,915.87

4

estimate as "excessively high." He stated he would be able to help Mr. Horner fix the house on weekends and occasionally after he got off work during the week.

¶ 12    In closing, the City argued that the building was dangerous and unsafe and the costs to make all necessary repairs far exceeded the value of the property. It stated the standard typically used to determine economic feasibility was "about 50 percent of the value of the property." The City agreed that its estimate used "prevailing wage" and that such wage only applied to public building construction but argued that reducing the cost estimate from prevailing wages to regular wages would not "diminish the repair cost enough to make this property repairable in an economic manner."

¶ 13    Horner disagreed that the property was unsafe and dangerous and that the buildings should be demolished, stating, "we don't agree that the tactic of bringing in entities to put out a cost sheet that in is no way representative of what a contractor would charge, and then say 'Well, that's over 50 percent of the value of the property' (snapped fingers) Bam! *** we've got to tear it down."

¶ 14    The court noted that half the fair cash value was about $34,000 and agreed that while anything was possible if enough money was thrown at it, the issue was whether it was "economically feasible." Addressing that issue, the court noted that the only way Horner's estimate came in under "half the value" was if the work performed was free. The court confirmed this by asking Horner, "But his estimate—the only way it comes in under 30,000 or 34,000 even, is there's no labor charges, correct?" Horner agreed.

¶ 15    The court also noted Borum's testimony that found the City's estimate too high and Horner's estimate too low. Horner said that $34,000 was where they were at and that was "basically what it would be if we're in the middle." The court responded by saying, "So right at 50 percent —in between the two is right at 50 percent of the value." Horner agreed, stating:

5

"And we're talking *** in the code she's referring to, *** it's over 50 percent of the value of the property where we start having trouble.

So if we quantify it at half of what they say it *** costs to be repaired, we're still at less—at 50 percent or less, and some things might be bidded out and be done for less.

***

So, basically, *** one of those things that what we're arguing about here is whether the cost to repair this structure exceeds 50 percent of the value. *** [I]f it exceeds 50 percent of the value under the municipal code, it should be demolished."

Horner concluded by stating, "the only issue here is whether or not the cost to repair is going to exceed that percentage, and that's all."

¶ 16    On January 14, 2020, the court issued its order finding the testimony of Sims and Whiting more credible and persuasive regarding the damage to the house and garage. After noting evidence of rodents, sewer gas, standing water, water infiltration, water penetration, various openings in the home, a lack of footings, and rot, the court found the house and garage were dangerous and unsafe. It then turned to the issue of reasonable repair, adopting the stipulated property value of $69,030. The court noted that if it accepted the City's estimate outright, it would not be reasonable to repair given the property value but if it accepted Horner's estimate, it would be reasonable to allow for repairs. The court agreed that the prevailing wage rate unfairly increased the cost for residential repair but found Horner's estimate was not credible. The court also expressed concern over Horner's ability to bring the buildings up to code along with Borum's ability to accomplish a substantial remodel in a reasonable time frame while working his regular job at Casey Rentals. The court also questioned Horner's qualifications to provide the estimate. The court stated, "While neither estimate was perfect, the Court finds it is reasonable to believe that the cost would be far

6

closer to the City's estimate than the Defendant's estimate." The court found the City met its burden and the expert testimony and photos supported its findings that the buildings were unsafe, dangerous, and unreasonable to repair. Thereafter, the trial court ordered demolition of the house and outbuilding.

¶ 17    Horner filed a motion to reconsider on February 13, 2020, arguing that reliance on the City's estimate was inaccurate because it was based on prevailing wage and that Borum's estimate was accurate. The argument was supported with a printout of the Williamson County prevailing wage rates, copies of estimates from four contractors regarding the work Horner could not complete on his own, as well as a receipt for some of the materials. After recalculating the estimates, Horner argued, "The cost of repair is closer to the estimate of Jerry Borum than of the Architect's Opinion of Probable Cost and is below the 50% threshold found in the City of Herrin municipal code." The City objected to Horner's motion.

¶ 18    On June 10, 2020, the trial court denied the motion, finding Horner made no showing that the evidence had not yet been discovered or was otherwise unobtainable at the initial hearing. Defendant timely appealed.

¶ 19                                    II. Analysis

¶ 20    On appeal, Horner contends that the circuit court's demolition order was in error because the experts agreed the buildings were repairable and the trial court failed to provide an actual value for the cost of repair.

¶ 21    Section 11-31-1 of the Code allows for the demolition of dangerous and unsafe buildings. 65 ILCS 5/11-31-1 (West 2018). Our courts require two findings: (1) that the building is dangerous and unsafe and (2) that the "the structure is substantially beyond repair." *City of Aurora v. Meyer*, 38 Ill. 2d 131, 137 (1967). The latter finding "must be based on a comparison of the cost of repair

7

with the value of the building." *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 131 (2004). The Code contemplates repairs when feasible and demolition when the state of deterioration is such that repairs would amount to substantial reconstruction. *City of Aurora*, 38 Ill. 2d at 135. "There is a strict policy in Illinois not to order demolition of buildings unless the structure is substantially beyond repair, and courts granting demolition decrees are required to specify the defects which render the building dangerous and unsafe." *Schwartz v. City of Chicago*, 21 Ill. App. 3d 84, 95-96 (1974). The statute implies that, if the property can be repaired with comparatively little expense, the city ought to adopt this course rather than complete demolition. *City of Aurora*, 38 Ill. 2d at 137. "[O]nly in cases where the structure is substantially beyond repair is an order for demolition contemplated." *Id*. In demolition cases, courts "should find from the evidence what the specific defects are which render the building dangerous and unsafe." *Id*. If those defects "may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make repairs." *Id*. "The gist of *City of Aurora* is that demolition is justified only if repair makes so little economic sense that it is unlikely that an owner would make use of any further opportunity to repair." *Village of Lake Villa*, 211 Ill. 2d at 131.

¶ 22 On review, we look to determine whether the trial court's findings were against the manifest weight of the evidence. *Village of Ringwood v. Foster*, 405 Ill. App. 3d 61, 74 (2010). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *Id*. at 74-75.

¶ 23 The trial court found the City met its burden by proving: (1) the buildings were dangerous and unsafe and (2) beyond reasonable repair. Nothing in Horner's brief contends that the trial

8

court's initial finding was erroneous. As such, our review is limited to determining whether the evidence supported the trial court's finding that the building was beyond reasonable repair.

¶ 24    The value of the property, $69,030, was not in dispute. Conversely, the cost to repair ranged from Horner's estimate of $21,185 to the City's estimate of $63,915. The trial court did not accept either estimate, finding neither was "perfect." The court noted the City's use of the prevailing wage for labor as well as Horner's failure to include any labor costs despite not being able to perform all the required repairs himself.

¶ 25    As such, the issue becomes whether the trial court's finding that "it [was] more reasonable to believe that the cost would be far closer to the City's estimate than the Defendant's estimate" was supported by the record. While Horner submitted evidence regarding the prevailing wage with his motion for reconsideration, the trial court denied the motion finding that defendant failed to show the newly discovered evidence existed before the initial hearing but had not yet been discovered or was otherwise unobtainable.[3] The only other evidence regarding "prevailing wage" was testimony confirming that a "prevailing wage" rate was higher than the "regular wage" rate. We note, however, that even if the prevailing rates and regular rates appeared in the record, the City's estimate failed to include the number of hours appropriated to each repair in order to recalculate the estimate using the "regular rate."

¶ 26    "[E]vidence comparing repair cost to value" (*Village of Lake Villa*, 211 Ill. 2d at 131 (citing *City of Aurora*, 38 Ill. 2d at 136)) is required to determine if a building is substantially beyond reasonable repair. Just as the "current value of the building" was necessary to make such a finding in *Village of Lake Villa* (*id.*), the repair cost must also be known. The City admitted its repair cost

---

[3]Horner provided no argument, or citation to authority, related to the trial court's disposition of the motion. The order is simply mentioned in a footnote on the last page of the brief. Therefore, Horner forfeited the issue, and we need not consider it. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

was inaccurate due to using "prevailing wage" rates. While the City argued that reducing the cost estimate from prevailing wages to regular wages would not "diminish the repair cost enough to make this property repairable in an economic manner," there was no evidence submitted to support the contention. Therefore, we review the remaining evidence to determine if that material supports the trial court's statement and reliance on the Herrin ordinance.

¶ 27    Herrin's code administrator testified that he was familiar with section 5-2-9 of the ordinance which addressed Herrin's fire limits and opined that the subject property had "been damaged by decay or other causes to an extent greater than 50 percent of its value." He stated the remedy for such building was "[t]hat it should be demolished." No other options were available. He stated, "I don't believe repairing it would be an option. *** [D]emolish, I believe is the only option that we have available at this time."

¶ 28    A copy of the Herrin ordinance was admitted into evidence and contained the fire limit boundaries addressed by Craig. Section 5-2-2 stated:

> "That all that part of the City within the following described boundaries is hereby designated to be the fire limits of the City, namely: Beginning at the corner of North 17th and West Tyler Streets and from thence along Tyler Street to its intersection of North 12th Street; thence South along 12th Street, to its intersection with East Maple Street; thence West along Maple Street to South 17th Street; thence along North 17th Street to the Place of Beginning." Rev. Code of Ordinances of Herrin, Illinois, Art. II, § 5-2-2 (2018).

¶ 29    Reliance on a city ordinance to determine whether a building is beyond reasonable repair is proper (*Village of Ringwood*, 405 Ill. App. 3d at 79-80); however, we find no evidence in the record establishing that Horner's property was located within Herrin's fire limit boundaries.

10

¶ 30    While the record contains no map of the area, "an appellate court may take judicial notice of matters not previously presented to the trial court when the matters are capable of instant and unquestionable demonstration." *Boston v. Rockford Memorial Hospital*, 140 Ill. App. 3d 969, 972 1986) (citing *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159 (1976)). Our supreme court has held that the "extension of the doctrine of judicial notice to include facts which, while not generally known, are readily verifiable from sources of indisputable accuracy is an important aid in the efficient disposition of litigation, and its use *** is to be commended." *People v. Davis*, 65 Ill. 2d 157, 165 (1976). This includes taking judicial notice of the locations of streets, the distance between them (*Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177-78 (2003); *People v. Rojas*, 359 Ill. App. 3d 392, 409 n.9 (2005)), as well as information acquired from mainstream Internet sites such as MapQuest and Google Maps. See *Hoskin v. Union Pacific R.R. Co.*, 365 Ill. App. 3d 1021, 1023-25 (2006); *People v. Stiff*, 391 Ill. App. 3d 494, 503-04 (2009).

¶ 31    We take judicial notice of a map containing both the Herrin fire limit boundaries and Horner's property. (See map labeled as Appendix in paragraph 40 of this decision.) The map reveals that Horner's property does not lie within Herrin's fire limit boundaries. As such, the Herrin ordinance, which deemed it "unlawful to repair any existing frame building within the fire limits after the same has been damaged by any cause to fifty percent (50%) of its value," was inapplicable.

¶ 32    Considering the arguments presented, in conjunction with the trial court's statements at the hearing, we find that Herrin's ordinance was the crux of the City's case. As such, we infer that the trial court's statement that it was "reasonable to believe that the cost would be far closer to the City's estimate than the Defendant's estimate" can only relate to the 50% demolition requirement

11

found in Herrin's ordinance. As such, the trial court's finding that it was not economically feasible to repair the buildings was not supported by the record and is against the manifest weight of the evidence.

¶ 33     The City also argues that repair was not only unreasonable due to economic infeasibility, but also due to the uncertain and presumably prolonged timeline for repair by Horner. Although no citation was provided to support the argument, we find support for the contention in *Village of Ringwood v. Foster*, 2013 IL App (2d) 111221, which declined to limit findings of unreasonable repair solely on the basis of cost. *Village of Ringwood*, 405 Ill. App. 3d at 79 ("[W]e do not interpret the supreme court's statement as precluding a finding that repairs may be unreasonable for some reason other than cost."). However, the basis for unreasonable repair in *Village of Ringwood* was not a lengthy time to repair, but an ordinance barring repair in cases where the repair was greater than 50% of the property's value. *Id*.

¶ 34     We note our supreme court's interpretation of the Code considered "readily" repairable issues; however, that same court stated:

> "Although not expressed in so many words, the plain implication of the act involved here is that if the property can be repaired with comparatively little expense the city ought to adopt this course rather than complete demolition, that only in cases where the structure is substantially beyond repair is an order for demolition contemplated. There are many kinds of deficiencies which would render a building dangerous and unsafe, but which can readily be obviated by appropriate repairs. Inadequate wiring, or a weakened supporting beam as in the case at bar, even if serious enough to sustain a finding that the structure is dangerous and unsafe, would not in many cases warrant complete destruction. The cost of repairs may well be a small fraction of the building's value. The court should find from the

12

evidence what the specific defects are which render the building dangerous and unsafe. If they are such as may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs." *City of Aurora*, 38 Ill. 2d at 137.

¶ 35    In the case at bar, while the evidence revealed numerous code violations, none of the experts testified that the buildings could not be timely repaired. Based on the City's experts, the repairs could be made in three months. Horner provided no specific time frame, but his availability to make repairs was limited to evenings and weekend. Regardless, the City fails to cite and we find no authority allowing for demolition based solely on the length of time required to make the necessary repairs and decline to expand the Code's interpretation to allow such action, especially in the absence of a reliable economic analysis or an ordinance requiring an exact standard, neither of which are applicable in this case.

¶ 36    The City's estimate is admittedly inflated due to reliance on prevailing wage labor rates. The record contains no evidence that would allow a trier of fact to determine the actual repair costs, as the City's values encompassed both materials and labor for the repairs. As such, the record fails to contain reliable and sufficient evidence necessary to perform the required economic feasibility analysis. While analysis using a more definite standard, like an ordinance setting a specific percentage requiring demolition, is proper, such analysis cannot be sustained if, as here, the underlying ordinance is inapplicable. As this was the basis of the trial court's decision, the trial court's finding that the buildings were damaged beyond reasonable repair was against the manifest weight of the evidence.

13

¶ 37                                    III. CONCLUSION

¶ 38    For the foregoing reasons, we vacate the trial court's finding that it was unreasonable to allow defendant to repair the buildings and reverse the order authorizing the City of Herrin's demolition of defendant's property.


¶ 39    Reversed.

¶ 40                 APPENDIX

Google Maps     **1212 W Tyler St**



Map data ©2021    500 ft