No. 2-09-0473     Filed: 6-9-10  Modified 7-13-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF RINGWOOD, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 07--MC--2 |
| | ) | |
| DEBORAH FOSTER, | ) | Honorable |
| | ) | Michael J. Sullivan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

Modified Upon Denial of Rehearing

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Deborah Foster, appeals from the trial court's order authorizing plaintiff, the Village of Ringwood, to demolish defendant's building pursuant to section 11--31--1(a) of the Municipal Code (Code) (65 ILCS 5/11--31--1(a) (West 2006)).  On appeal, defendant argues that the trial court's order must be vacated because it erred in finding her building "dangerous and unsafe" under the Code, because it erred in finding that she could not reasonably repair the building, and because plaintiff did not provide the notice the Code requires.  For the reasons that follow, we vacate the trial court's order and remand for further proceedings.

In June 2007, plaintiff filed a complaint seeking authorization pursuant to section 11--31--1 of the Code to demolish a two-story apartment building defendant owned; the matter later proceeded to a bench trial.  At the trial, defendant testified that she purchased the apartment building, which was

created in "the late 1800's," for $480,000 in July 2005. She recalled that the building was damaged by a fire in October 2006 and had not been occupied since and that, as a result of the fire damage, she received an insurance check, which she never cashed, for over $345,000. Defendant acknowledged having received a November 2006 letter from plaintiff's counsel informing her that plaintiff's ordinances prevented her from rebuilding and restoring the building to its prior use and giving her notice that she had to demolish the building "on or before May 15, 2007." (Defense counsel objected on hearsay grounds to the admission of this letter into evidence. The trial court admitted it "for the limited purpose of showing notice," but not for the purpose of establishing the truth of the matters stated in the letter.) Defendant further acknowledged having received an April 2007 letter to the same effect. (Defense counsel again objected to the admission of the letter, but the trial court again allowed the letter to be admitted into evidence for the purpose of establishing that defendant received notice from plaintiff.)

Timothy Coppack, an insurance adjuster who inspected the property shortly after the fire, estimated the total damage to the building at approximately $350,000 (net of depreciation, which he estimated at approximately $110,000). He estimated that the property was worth approximately $640,000 prior to the fire. Nathan Michaelson, a second adjuster, who said that the fire damaged the roof and led to smoke and water damage to the building, estimated the cost to repair the damage to the building at over $550,000 (including overhead and profit for the contractor who would perform the repairs). Michaelson recalled that defendant agreed to allow his company to perform repairs on the building but that his company performed no repairs because village officials told him "that they did not like the structure, that it looked like it would not be grandfathered in, and that most likely that type of building would not be able to be rebuilt" but instead "would have to be razed." The village

officials further explained to him that "if it's over fifty percent physically damaged, *** [the village has] an ordinance that says it has to be razed."

Plaintiff's village president verified that the village had a zoning ordinance that provided as follows:

> "If any nonconforming building or structure is destroyed by any means to an extent of more than fifty (50) percent of the replacement cost of that portion of the principal and accessory buildings which are above the average ground elevation, such building or structure shall not be rebuilt or reoccupied for any [nonconforming use]."

Defendant does not dispute the accuracy of this testimony. Further, neither party now disputes that defendant's building was a nonconforming structure.

Plaintiff's building commissioner, Richard Boettcher, who examined the building after the fire, recalled that, on the second floor, there were "holes in the ceiling where the light was coming through," as well as holes in the floor that allowed him to see down to the first floor. He further recalled that "[e]verything was soaked," that the wood and walls in the building had been burnt or damaged, that "[t]he building was full of wires, bare wires hanging out of the ceiling," that many of the joists had been destroyed by the fire, and that counters, cabinets, and windows in the apartments had been destroyed or badly damaged. Although Boettcher described extensive fire damage on the second floor, he stated that most of the damage on the building's first floor was caused by water. He also stated that he detected a strong smell of mold in the building.

Barry Schlieben, a general contractor, architectural draftsman, home inspector, and appraiser, testified that he had inspected the building at plaintiff's request. He estimated that the second floor of the building was "75 to 80 percent completely destroyed," meaning that "everything in that section

of the building would have to be disassembled." Schlieben said that the second-floor ceiling, most of its interior walls, "[a] lot" of the studs for the exterior walls, "a lot" of the electrical wiring, the heating system, the windows, and the apartments' kitchens and bathrooms had been destroyed or needed to be replaced. He concluded that the second floor required that "the framing material from the walls, roof, ceiling would all have to be *** completely removed and reconstructed" and that "[a]pproximately 75 percent of [the] roof would have to be reconstructed." He said that he observed on the first floor "[a] lot" of water and smoke damage that would require replacing the drywall, the windows and doors, the kitchen and bathroom appliances, the heating system, and the hallway flooring, and sealing or replacing the wall framing. For the basement of the building, Schlieben stated that the ceiling would have to be sealed and debris cleaned out. He estimated the total cost of the necessary rebuilding at over $500,000, including 10% overhead and 10% contractor profit (for a total add-on of approximately $82,000), and that figure was broken down in a written estimate admitted into evidence. (The written estimate included $35,000 for "demolition," almost $35,000 for washing and sealing of the entire building including the basement, and over $430,000 in other costs unrelated to the basement.) He said that his estimate included upgrades (fire-stopping and electrical upgrades) to make the building code-compliant. His estimate also included appliances such as dishwashers and window air conditioners.

Frank Harrison, a real-estate appraiser, estimated the replacement cost of the building as approximately $567,000 including the basement, or approximately $539,000 without the basement. His estimates did not include appliances.

The first witness in defendant's case-in-chief, Allen Stott, a home contractor whom defendant asked for an estimate for the repairs to her building, testified that he saw smoke damage as well as

water damage, which was "[n]ot bad at all," on the first floor of the building. He identified fire damage on the second floor, but he opined that the "[p]lace wasn't too bad." Stott recommended that the building receive a new roof, new windows, new drywall for "all [of] the upstairs" and "some of the downstairs," "some electrical" work, "a cabinet or two here or there," and "a clean up and prime, paint." He proposed doing the work for just under $274,000. Stott proposed a price for installation of new drywall much lower than other estimates had proposed, but he agreed on cross-examination that his bid did not include finishing floors, kitchen cabinets (which he said could be wiped down instead of replaced), or appliances. Plaintiff's attorney also listed several items not specifically included on Stott's estimate (such as removing mold, sealing damaged wood, adding fire stops, and replacing damaged flooring), but Stott testified that several were impliedly included in the estimate, either because he would have had to perform the tasks to make the building code-compliant or because the estimate indicated that he and defendant could discuss the project in greater detail at a later date.

Called as a witness on her own behalf, defendant recalled that some of the building's second-floor drywall had been damaged but that the walls were intact and the cabinets "dirty" but not burned. She noticed minimal damage on the first floor. She also recalled that Boettcher, the village inspector, responded to her saying that she intended to fix the building by saying "well, no way, Jose, are you getting a permit; the Village of Ringwood is very happy that [it has] the opportunity to get rid of this building." Defendant said that she wanted to restore the building and that she had the funds to do so. She recalled that she solicited bids and designs for the repair work, but she acknowledged that she never submitted an application for a building permit.

Dale Alvine, defendant's brother and a self-employed contractor, testified that, upon his inspection of the building, he saw roof damage, burn damage on "the top two feet" of the "lumber" on the second floor (with "the rest of the board [being] fine"), melted wiring, and "sooted up" but "salvageable" "vanity tops." Alvine opined that "basically the damage tended to be at the eight-foot and above range" from the floor. He testified that much of the structure of the building remained sound after the fire. He estimated that the necessary repairs would cost approximately $244,000. His estimate included, among other things, new fixtures for those he deemed in need of replacement, new heating and cooling units, new wires, and painting.

Ralph Schmidt, an expert in the field of structural engineering, testified that he viewed the first floor of the building as having water damage but walls that were intact. He said that the second floor had roof damage and that "the upper portion of some of the walls [was] burnt," but, "[o]nce you got *** a few feet down the walls were intact similar to the first floor." Schmidt assessed "a lot of interior type damage but nothing that relate[d] to the skeleton" of the building. He concluded that the building's structure was "less than 50 percent destroyed." On cross-examination, he clarified that his estimate included "finishes generally speaking" and that "structural engineering" "included up to the inside walls but *** not *** the interior type finishes." He further agreed on cross-examination that, when he delivered his estimate to defendant, he recommended that she contact a general contractor for more detailed cost estimates.

The trial court took the matter under advisement before issuing a written decision, which provided as follows in pertinent part:

"7. As used at the time of the fire ***, the *** building *** was a nonconforming structure because its use was not in conformity with the uses permitted in the B-1

Neighborhood Business District. Further, the building did not conform to the Yard and Bulk Requirements of the Zoning Ordinance.

***

9. *** [T]here is interplay between a demolition statute *** and a local ordinance which limits the ability to reconstruct a nonconforming structure which has been destroyed.

10. This court believes that the interplay *** comes into consideration where the trial court considers [whether the building is beyond reasonable repair, so that section 11--31--1 of the Code may be invoked].

11. This court believes that in this case the standard of what constitutes 'beyond reasonable repair' is the requirement of the Village's Local Ordinance ***.

***

13. As a result of the fire ***, the Court finds that the subject building was and is in its damaged and unreconstructed state a dangerous and unsafe building.

***

15. The Court believes that the evidence as to the replacement cost of the subject building without a basement in the amount of [approximately $539,000] *** was the most credible evidence on the topic based on the expertise and methodology of the witness, Frank Harrison ***.

16. The Court believes that the most thorough, comprehensive and credible evidence as to the cost of repair of the subject building was the cost of repair estimate of [approximately $500,000] given by Barry P. Schlieben.

17. The Court believes that the cost of repair estimates given by Allen Stott in the amount of [approximately $274,000] and by Dale Alvine, the Defendant's brother, in the amount of $244,000[] lacked detail and specificity as did the testimony supporting the estimates. ***

18. The finding of dangerous and unsafe in this case is based upon the evidence that:

a) At least eighty (80%) percent, if not all, of the roof was totally damaged and destroyed.

b) The second story of the building was the subject of extensive fire damage to the structure of the building (rafters, joists, and wall studs), extreme water and smoke damage in all areas of the second floor.

c) The first floor, while spared most of the direct fire damage, did suffer extensive water and smoke damage.

d) The heat from the fire destroyed, even melted, substantial portions of the building's electrical system and heating system.

e) The fire, water and smoke caused significant damage to the building's fixtures, particularly on the second floor.

f) Substantially all of the windows in the building were damaged or destroyed by the fire or attempts to extinguish the fire.

g) The flooring in the building, no matter what type of flooring, has been substantially damaged throughout the building.

19. This Court finds that under the provisions of the Village's Local Zoning Ordinance *** the subject building has been destroyed to an extent of more than fifty (50%) percent of

the replacement cost of the principal building above the ground elevation and is, therefore, beyond reasonable repair for the purposes of Section 11--31--1 of the [Code].

20. The Court [finds] *** that the subject building could *** be repaired, but the Court [finds] that the cost of repair is more than fifty (50%) percent of the replacement cost of the subject building as stated above. In fact, the Court believes that the more credible evidence established that the cost of repair is substantially more than fifty (50%) percent of the replacement cost.

21. The Court finds that the Village did comply with the notice requirements of Section 11--31--1 of the [Code]. While the Court did admit the letter [from plaintiff to defendant] dated [November 2006] for a limited purpose, the limited purpose was to establish that the Village gave notice to the Defendant. The Court believes that the Village has met this evidentiary requirement."

The court thus ordered that plaintiff be allowed to demolish defendant's building. Defendant timely appeals.

Defendant's first argument on appeal is that the trial court did not enter findings sufficient to justify demolition under the Code. Section 11--31--1(a) of the Code, the statute the trial court invoked to order the building's demolition, provides as follows, in pertinent part:

"The corporate authorities of each municipality may demolish, repair, or enclose or cause the demolition, repair, or enclosure of dangerous and unsafe buildings or uncompleted and abandoned buildings within the territory of the municipality ***. ***

The corporate authorities shall apply to the circuit court of the county in which the building is located (i) for an order authorizing action to be taken with respect to a building

if the owner or owners of the building, including the lien holders of record, after at least 15 days' written notice by mail to do so, have failed to put the building in a safe condition or to demolish it or (ii) for an order requiring the owner or owners of record to demolish, repair, or enclose the building ***."  65 ILCS 5/11--31--1(a) (West 2006).

The trial court here found defendant's building "dangerous" and "unsafe"; there has been no suggestion that the building was "uncompleted" or "abandoned."  We therefore consider only the former two qualifications, "dangerous" and "unsafe."  The two words are roughly synonymous (see Webster's Third New International Dictionary 573 (1993) (defining "dangerous" as, among other things, "demanding caution or care as extremely unsafe"); Webster's Third New International Dictionary 2509 (1993) (defining "unsafe" as "exposed or exposing to danger"); see also Webster's Collegiate Thesaurus 181 (1988) (listing "unsafe" as a word related to "dangerous")), the parties urge no distinction between them, and the case law has recognized none (see, e.g., City of Aurora v. Meyer, 38 Ill. 2d 131, 133 (1967) (considering the terms "dangerous" and "unsafe" simultaneously). We therefore consider the terms as one.

Defendant argues that the trial court's findings were insufficient to establish that her building was dangerous and unsafe under section 11--31--1(a) because plaintiff introduced no evidence that the building was unsafe to "the general public"--primarily those people who might pass near the structure but not enter, or the community surrounding the structure.  Plaintiff responds by disputing that the statute requires that a building present a hazard to "the general public," and by arguing that a building may be considered dangerous even if the danger is borne by only a specific segment of the public.[1]  The parties present us with a question of statutory interpretation.  Such questions raise issues

---

[1]In her petition for rehearing, defendant argues at length that our analysis below is erroneous,

of law to be reviewed <u>de novo</u>. <u>Tarsitano ex rel. Township of High School District 211 v. Board of Education of Township High School District 211</u>, 385 Ill. App. 3d 868, 872 (2008).

A court's goal in interpreting a statute is to ascertain and give effect to the intent of the legislature, and the best indication of that legislative intent is the statute's language, given its plain, ordinary, and popularly understood meaning. <u>Bigelow Group, Inc. v. Rickert</u>, 377 Ill. App. 3d 165, 169 (2007). Thus, a court generally may not add limitations or conditions to a statute when none are expressed. <u>Bigelow</u>, 377 Ill. App. 3d at 169. Here, as plaintiff argues, section 11--31--1 uses the phrase "dangerous and unsafe" without qualification, and without mention of any limitation to dangers that affect "the general public," as opposed to dangers that affect only those who enter a structure. Defendant provides us no cause for reading such a limitation into the statute.

A court interpreting a statute must also examine the statute as a whole, so that "words and phrases [are] interpreted in light of other relevant provisions of the statute." <u>J.S.A. v. M.H.</u>, 224 Ill. 2d 182, 197 (2007). Additional language from subsection (e) of the statute adds to our understanding of the statute. 65 ILCS 5/11--31--1(e) (West 2006). Subsection (a) sets out a procedure by which local government entities may obtain court orders allowing them to demolish "dangerous and unsafe buildings or uncompleted and abandoned buildings": the procedure involves a period of notice followed by court proceedings to adjudicate the government's authority to demolish the structure.

---

even "tortured," because it contradicts a line of cases that requires danger to the "public" in order for section 11--31--1 to apply. However, our discussion below does not contradict that idea; it considers whether the statute's purpose to protect the "public" includes only the "general public," as defendant would have it, or specific portions of the public (such as those who might enter the building), as plaintiff would have it.

-11-

65 ILCS 5/11--31--1(a) (West 2006). Subsection (e) sets out a special procedure allowing municipalities to "expedite the removal of certain buildings" by potentially forgoing court proceedings; this procedure applies to a building the municipality determines is "open and vacant and an immediate and continuing hazard to the community in which the building is located." 65 ILCS 5/11--31--1(e) (West 2006). The wording of subsection (e) bolsters plaintiff's interpretation in two ways. First, this wording tells us that, when it drafted section 11--31--1, the legislature made explicit reference to a hazard "to the community" in at least part of the section, subsection (e). That implies that the omission of the same phrase from subsection (a) was intentional. Second, such an omission stands to reason based on the structure of the section as a whole. Subsection (e)'s expedited procedure is an exception to the general procedure described in subsection (a). We therefore presume that subsection (e)'s scope is more limited than that of subsection (a). Accordingly, we must interpret subsection (a)'s use of the phrase "dangerous and unsafe" buildings to include something more than buildings that are "open and vacant and an immediate and continuing hazard to the community"; while subsection (e) applies only to those urgent situations in which a building poses a danger "to the community," subsection (a) applies to a wider range of buildings, namely, buildings that do not fall within the "immediate and continuing hazard to the community" restriction.[2]

_____

[2]In her petition for rehearing, defendant attacks on two fronts our analysis of subsections (a) and (e) of the statute. First, she argues that "[i]t is hard to believe" that the legislature intended that "[i]mmediate threats to the community *** are the only ones that merit quicker redress" while "immediate threats to those connected to *** the building must go through the normal--slower--process." On the contrary, such a scheme--forgoing some process in the face of a wider danger--seems quite reasonable. Second, defendant cites subsection (f) of the statute, which applies to

Further, the limitation defendant urges--limiting "dangerous and unsafe" buildings governed by subsection (a) to those that pose a danger to the general public and excluding buildings that pose a danger only to those connected to the building--would frustrate the purpose underlying the statute. In Village of Lake Villa v. Stokovich, 211 Ill. 2d 106 (2004), the supreme court examined in some detail the purpose animating section 11--31--1. In Stokovich, the defendants challenged the constitutionality of section 11--31--1 on the basis that it deprived them of their property rights under the due process clauses of the Illinois and United States Constitutions. Stokovich, 211 Ill. 2d at 121-30. The supreme court began its analysis by determining what level of scrutiny to apply to the statute, and it began that analysis by setting out the nature of the property rights at issue:

"This court has long acknowledged that '[e]very owner has a right to use his property in his own way and for his own purposes, subject only to the restraint necessary to secure the common welfare. This is both a liberty and a property right.' [Citation.] The phrase 'restraint necessary to secure the common welfare' refers to the police power of the state under which the state 'may act to regulate, restrain or prohibit that which is harmful to the public welfare

_____

"property that presents an actual or imminent threat to public health and safety caused by the release of hazardous substances." 65 ILCS 5/11--31--1(f) (West 2006). According to defendant, the legislature would have clarified its use of the word "public" in subsection (f) if it thought of the "public" as somehow broader than the "community" referred to in subsection (e). We disagree. It is much more unlikely that the legislature would have intended to restrict the reach of a provision dealing with hazardous waste by applying it only to dangers to the surrounding "community" rather than the "public," which we have interpreted to include the surrounding community as well as those connected to the property.

-13-

even though the regulation, restraint or prohibition might interfere with the liberty or property of an individual.' [Citation.]" Stokovich, 211 Ill. 2d at 124.

To explain the scope of the police power to avoid "harm[] to the public welfare," the supreme court cited two cases in which it had held that government abatements of property rights were appropriate exercises of the police power because the government actions were rationally related to the government interests. In the first case, Chicago National League Ball Club, Inc. v. Thompson, 108 Ill. 2d 357 (1985), the court upheld as within the police power a statute and an ordinance prohibiting nighttime events at Wrigley Field in Chicago, because the laws were "intended to abate a public nuisance" of "the 'intolerable noise' created by nighttime sporting events." Stokovich, 211 Ill. 2d at 124. In the second case, Beverly Bank v. Illinois Department of Transportation, 144 Ill. 2d 210 (1991), the court upheld a statute prohibiting new residential construction on a floodplain, based on "[t]he legislative purpose of this exercise of the police power *** to reduce the potential for flood damage, to protect the health and welfare of residents, and to reduce the need for emergency relief services." Stokovich, 211 Ill. 2d at 125. The supreme court in Stokovich then concluded that, based on the nature of the rights implicated by section 11--31--1, its constitutionality should be measured by the rational-basis test:

"Section 11--31--1 of the Code is in some respects similar to the statute and ordinance at issue in Chicago National League Baseball Club. That is, its purpose is to abate a public nuisance. And, like the statute at issue in Beverly Bank, section 11--31--1 interferes with a property owner's ability to choose how he would use his land. We agree with the Village that a property owner does not have a fundamental right to permit his property to fall into such disrepair as to create a risk to the health and safety of the public. We conclude that, like the

statutes at issue in <u>Chicago National League Baseball Club</u> and <u>Beverly Bank</u>, section 11--31--1 was enacted pursuant to the state's police power and is, therefore, subject to review under a rational basis standard ***." <u>Stokovich</u>, 211 Ill. 2d at 125.

Although <u>Stokovich</u> described the purpose of section 11--31--1 as "abat[ing] a public nuisance" (<u>Stokovich</u>, 211 Ill. 2d at 125), and although the particular dangers at issue in <u>Stokovich</u> implicated the safety of the general public and not just those connected to the property (see <u>Stokovich</u>, 211 Ill. 2d at 129 (citing "a threat of release of methane gas, of contamination of the water supply," and of the building's providing "a habitat for mice and other vermin that pose a risk of communicable disease")), our reading of the supreme court's decision leads us to conclude that the court did not intend to limit the purpose of the statute to remediation of dangers that imperil the public generally, to the exclusion of dangers that affect only those connected to the building. Rather, the quoted phrases aside, a reading of the entirety of the supreme court's analysis leaves the impression that it assumed the purpose of section 11--31--1 to be to effectuate (and be coextensive with) government police power to protect public welfare. As illustrated by <u>Beverly</u>, one of the cases cited and described in <u>Stokovich</u>, that police power extends even over dangers, such as the risk of flood damage to a home or the risk to a particular resident's health or welfare, that do not affect the public generally, but instead affect only those directly connected to the property.[3] Thus, in <u>City of</u>

---

[3]Defendant overlooks this point in her petition for rehearing, in which she argues that "[t]he Supreme Court has never stated or even hinted that the scope of 11--31--1 was so expansive." The supreme court in fact strongly so hinted when it cited <u>Beverly</u> as an example of the police power that defines the reach of section 11--31--1. Defendant also says that the flood-plain regulation in <u>Beverly</u> "obviously involved more than just those directly connected to a certain property." However, other

Aurora, the supreme court suggested that "[i]nadequate wiring, or a weakened supporting beam," could render a structure "dangerous and unsafe" under section 11--31--1. City of Aurora, 38 Ill. 2d at 137. Further, the supreme court in City of Aurora did not take issue with (either to denounce or affirm) the plaintiff's position that the building at issue was unsafe due to " 'electrical wiring, structural defects, unsanitary plumbing, unsafe floors, walls, roof and windows, and [deteriorating] exterior brick and mortar' " (City of Aurora, 38 Ill. 2d at 134); it instead remanded the case on an evidentiary issue "without prejudice to the right of the city to take whatever steps may be necessary to render the building safe," without specifying what steps the court envisioned (City of Aurora, 38 Ill. 2d at 138).

Based on the above discussion, we conclude that a structure may be deemed "dangerous and unsafe" under section 11--31--1 even if the danger is confined to those connected to the property, rather than the public at large. Defendant makes no argument that the trial court's findings, and the evidence supporting them, were insufficient to establish that the building here presented such a danger. In fact, defendant agrees in her briefs that the damage to the building rendered it uninhabitable. We therefore reject defendant's argument that the trial court erred in concluding that the building was "dangerous and unsafe" under the statute.[4]

---

than saying that the point is "obvious," defendant does not explain why a restriction on building on a flood plain directly protects anyone other than those who would build on the flood plain.

[4]In her petition for rehearing, defendant objects that she did not make any argument regarding the danger to those connected to the building because, before our ruling, case law did not indicate that such dangers fall within the reach of section 11--31--1. However, now that we have held that section 11--31--1 does extend to such dangers, the only argument defendant offers is that there was not "any significant testimony supporting the conclusion that the property is unsafe and dangerous

Defendant's second argument is that the trial court erred by consulting plaintiff's ordinance to set the Code's standard for when repair could not be reasonably accomplished, so that the demolition of defendant's building could be compelled, and by concluding that the damage here met the 50% standard.

We begin with the latter question. As noted above (slip op. at 3), the parties agree that the ordinance provides as follows:

"If any nonconforming building or structure is destroyed by any means to an extent of more than fifty (50) percent of the replacement cost of that portion of the principal and accessory buildings which are above the average ground elevation, such building or structure shall not be rebuilt or reoccupied for any [nonconforming use]."

Defendant does not dispute the trial court's finding that the replacement cost of the structure was approximately $539,000. The question here, then, is whether there was sufficient evidence to support the trial court's finding that defendant's building was damaged to an extent of over 50% of that figure, or approximately $269,500. When defendant argues that the evidence was insufficient to support that finding, she challenges a factual finding by the trial court. We will not disturb such findings unless they are against the manifest weight of the evidence. E.g., City of Chicago v. Old Colony Partners, L.P., 364 Ill. App. 3d 806, 812 (2006). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." Best v. Best, 223 Ill. 2d 342, 350 (2006).

---

to anyone." Defendant overlooks testimony regarding the wiring and structural problems the building sustained in the fire, as well as the trial court's finding of dangerousness.

Defendant argues that Schlieben's repair estimate, on which the trial court relied to establish the damage to the building, included not only repair of the damage but a full renovation, including improvement of the building from its prior state to bring it into compliance with plaintiff's building code. Defendant further notes that, because the trial court resorted to the cost of repair to assess the damage to the building, contractor overhead and profit were included in the damage figure. However, even discounting contractor add-on costs, Schlieben estimated the cost of repairs at almost $417,000. To the extent defendant argues that Schlieben overestimated the damage by including the cost of full replacement of items that were not fully destroyed, there was ample testimony that the partially damaged items that Schlieben proposed to replace were damaged to an extent to render them not usable. Thus, full replacement was a proper measure of the damage to those items. Finally, as to defendant's argument that upgrades for code compliance cannot be considered part of damage to the preexisting building, we cannot reasonably say that the upgrades discussed--installation of fire stops and wiring superior to that which had been destroyed--could raise the cost of repair from less than $269,500 to nearly $417,000. Thus, even if defendant is correct that the trial court might have overestimated the damage to some extent, we nonetheless cannot say that its ultimate finding, that the damage exceeded 50% of the replacement cost of the aboveground portion of the building, was contradicted by the manifest weight of the evidence.

With that, we move to defendant's argument that the trial court erred by consulting plaintiff's 50% ordinance in the first place to set the Code's standard for reasonable repair. The issue of the proper standard to be employed under the Code is a question of law, and we review it de novo. Tarsitano ex rel. Township of High School District 211, 385 Ill. App. 3d at 872. The supreme court's

decisions in City of Aurora and Stokovich are instructive on this point, and we now consider them at some length.

In City of Aurora, the defendant homeowner argued that the then-existing version of section 11--31--1, whose repair provisions contained no relevant changes from the current version (see City of Aurora, 38 Ill. 2d at 133, quoting Ill. Rev. Stat. 1965, ch. 24, par. 11--31--1), was unconstitutional and that the trial court's " 'dangerous and unsafe' " finding was against the manifest weight of the evidence (City of Aurora, 38 Ill. 2d at 132). The city sought an order authorizing demolition of the defendant's building for the above-quoted reasons, and, in court proceedings, it produced testimony regarding the problems with the building. City of Aurora, 38 Ill. 2d at 132-35. The defendant responded with evidence of the low cost to repair a structural problem with the building, but the trial court did not allow her to introduce evidence of the value of the building. City of Aurora, 38 Ill. 2d at 136. Thus, there was "no proof of the extent or proportion of its value to which the building had deteriorated," nor any evidence "comparing or evaluating the portions deteriorated and in bad condition as against those remaining in good condition, to determine whether demolition rather than repair was appropriate." City of Aurora, 38 Ill. 2d at 135.

The supreme court began its analysis by laying out the basic principle that demolition of private property should be forced sparingly:

"The law is well settled that in cases of this nature courts do not go further than is necessary to protect the public interest. Property may be ordered destroyed under certain conditions but only if the danger cannot be abated in any other way. It is only in cases where an absolute necessity exists that courts adopt the drastic method of correction by ordering destruction of the property. [Citations.] In other words the remedy is limited to the

necessities of the case. Where hazardous conditions may be remedied by repair without major reconstruction the building may not be destroyed. [Citation.]" City of Aurora, 38 Ill. 2d at 136-37.

Against that backdrop, the supreme court provided its interpretation of section 11--31--1:

"Although not expressed in so many words, the plain implication of the act involved here is that if the property can be repaired with comparatively little expense the city ought to adopt this course rather than complete demolition, that only in cases where the structure is substantially beyond repair is an order for demolition contemplated. There are many kinds of deficiencies which would render a building dangerous and unsafe, but which can readily be obviated by appropriate repairs. Inadequate wiring, or a weakened supporting beam as in the case at bar, even if serious enough to sustain a finding that the structure is dangerous and unsafe, would not in many cases warrant complete destruction. The cost of repairs may well be a small fraction of the building's value. The court should find from the evidence what the specific defects are which render the building dangerous and unsafe. If they are such as may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs." City of Aurora, 38 Ill. 2d at 137.

Based on its interpretation, the supreme court concluded that the trial court had erred in refusing to allow evidence of the value of the building to be demolished, and it remanded on that basis without reaching the issue of the constitutionality of section 11--31--1. City of Aurora, 38 Ill. 2d at 137. That is, "[a]ll" the court decided was "that by a fair interpretation of the statutory language the court must find the structure to be beyond reasonable repair before authorizing the extreme remedy of

demolition, and that evidence relating to the cost of such repair compared to the value was improperly excluded in" that case.  City of Aurora, 38 Ill. 2d at 137.

In Stokovich, the supreme court directly confronted the issue of the constitutionality of section 11--31--1, and, in doing so, it expounded on its interpretation of the statute's operation. Stokovich began by summarizing City of Aurora:

> "In City of Aurora, we noted that section 11--31--1 provides for repair or demolition in the alternative and, thus, 'contemplates repair where feasible and demolition where the state of deterioration is such that repairs would amount to a substantial reconstruction.' [Citation.] Even after the circuit court finds that the municipality has met its burden of proving the structure dangerous and unsafe, the court still may not order demolition unless substantial reconstruction would be necessary to correct the defects. [Citation.] *** Under these rules[, which allow demolition only if repair is not reasonable], evidence proffered by the property owner relating to the cost of repair must be considered by the court before authorizing demolition.  [Citation.]"  Stokovich, 211 Ill. 2d at 127-28.

The supreme court next addressed the property-owner defendants' argument that the interpretation of section 11--31--1 as incorporating the cost of repairs to determine the municipality's right to compel demolition was unconstitutional, because, according to the defendants, "after an adjudication that a building is dangerous and unsafe, a property owner must be given an opportunity to repair, regardless of cost."  Stokovich, 211 Ill. 2d at 128.  Applying the rational-basis test for constitutionality, the supreme court disagreed, and it instead concluded that section 11--31--1 implicated a legitimate state interest and embodied a reasonable method of furthering that interest. On the former point, the supreme court stated that, "[w]ithout a doubt, the demolition of a structure

that is dangerous and unsafe, when it has been demonstrated that the structure is not readily repairable, is rationally related to the legitimate state interest in public health and safety." Stokovich, 211 Ill. 2d at 129. On the latter point, after determining that the statutory 15-day notice requirement posed no problems under the facts of Stokovich, the supreme court explained as follows:

"The statutory framework chosen by the legislature is entirely reasonable and protects the rights of the property owner while permitting the municipality to deal expeditiously with threats to the public health and safety. Section 11--31--1 makes a reasonable distinction between properties that are readily repairable and those that are not. The statute guarantees a property owner the opportunity to make repairs, either before or after an adjudication of 'dangerous and unsafe,' if the property is readily repairable. If, however, the property is in need of substantial reconstruction to render it safe, a property owner who is willing to undertake such a project must *** undertake repairs promptly upon receiving notice. The owner of such a property who does not promptly undertake repairs, but instead chooses to contest whether the building is dangerous and unsafe and to litigate the question of whether the building is readily repairable, runs the risk that he will lose on the merits and an order of demolition will issue." Stokovich, 211 Ill. 2d at 130.

Having ruled the statute constitutional, the supreme court again turned to City of Aurora to determine how the statute should be applied:

"Section 11--31--1 requires two findings before an order of demolition may issue. The court must first find that the building is dangerous and unsafe. [Citation.] The court must also find that the building is beyond reasonable repair. ***

City of Aurora requires that the second finding--that the building is beyond reasonable repair--must be based on a comparison of the cost of repair with the value of the building. [Citation.] In City of Aurora, the circuit court refused to admit evidence [comparing the cost of repair with the value of the building]. [Citation.] We held that section 11--31--1 contemplates repair when it is feasible. [Citation.] Therefore, evidence comparing repair cost to value should have been admitted. [Citation.] *** The gist of City of Aurora is that demolition is justified only if repair makes so little economic sense that it is unlikely that an owner would make use of any further opportunity to repair. Because knowledge of the current value of the building is necessary to determine whether repair makes economic sense, City of Aurora requires that a court find current value before it may issue a demolition order." Stokovich, 211 Ill. 2d at 131.

The supreme court concluded that the trial court had received insufficient evidence to establish the worth of the building, and it therefore vacated the trial court's order allowing demolition and remanded the cause for further proceedings. Stokovich, 211 Ill. 2d at 131-33.

Defendant draws from the above case law the idea that, in determining whether demolition may be ordered under section 11--31--1, a trial court evaluating the owner's right to repair must employ "a flexible standard *** of reasonableness" rather than "a specific percentage." Thus, defendant argues, the trial court erred when it borrowed the 50%-of-replacement-cost standard from plaintiff's ordinance and applied it to determine whether repairs were reasonable under section 11--31--1. We agree with defendant that the ordinance's standard measures something different from the Stokovich test for reasonableness of repairs under the Code. The ordinance's 50% standard compares all of the damage to a building with the replacement cost of the building, while the

Stokovich test compares the cost of repairing the dangerous conditions with the value of the building. However, we disagree with defendant that this discrepancy invalidates the trial court's ultimate conclusion.

This case differs in one very significant respect from City of Aurora and Stokovich. In those cases, the only named impediment to repairing the subject buildings was the cost of repair. Thus, the supreme court evaluated the reasonableness of repair in terms of cost. Here, however, there exists another, even more definite impediment: plaintiff has an ordinance forbidding defendant's conducting repairs because the subject building does not conform to plaintiff's zoning ordinance. As noted above, the ordinance provides that, if the damage to a nonconforming building exceeds 50% of the replacement cost of the aboveground portion of the building, the building may not be rebuilt as a nonconforming building.[5] Although, as defendant points out in her briefs, the supreme court said in Stokovich that "City of Aurora requires that the second finding--that the building is beyond reasonable repair--must be based on a comparison of the cost of repair with the value of the building" (Stokovich, 211 Ill. 2d at 131), we do not interpret the supreme court's statement as precluding a finding that repairs may be unreasonable for some reason other than cost. Rather, we interpret the supreme court's statement as dictating the means for the normal, cost-based reasons presented in those cases for why a repair might not be reasonable. The repair in this case is unreasonable because

---

[5]Defendant makes no argument that she intended to "rebuild" or "repair" the building so that it became a conforming building, and, in any event, because the trial court found that the building was nonconforming as to bulk and yard requirements, demolition would very likely be required for such "rebuilding" or "repairs."

it is not allowed under plaintiff's ordinance, even if its cost might otherwise make it reasonable.[6] We therefore essentially agree with the trial court; for all intents and purposes, in this case, the ordinance's 50% standard determined whether defendant's proposed repairs were reasonable.[7]

---

[6]In her petition for rehearing, defendant mischaracterizes our point as follows: "The Court distinguishes City of Aurora and Stokovich [by] reasoning that in those cases the only 'impediment to repairing' the buildings was the cost of repair. [Citation.] This misstates the Supreme Court's holdings. In both [cases], the only potential 'impediment' to repairing the buildings was reasonableness." We of course agree that City of Aurora and Stokovich relied on a reasonableness test. Our point is that in those cases repair was unreasonable due to cost. Here, repair is unreasonable based on another factor: the ordinance barred such repair.

[7]It is true that, in Stokovich, the supreme court considered crucial to the constitutionality of section 11--31--1 the fact that its scheme grants the owner the opportunity to repair. However, our interpretation does not alter section 11--31--1's repair provisions; the obstacle to defendant's right to repair here comes not from section 11--31--1, but from plaintiff's ordinance. As plaintiff notes in its brief, ordinance provisions of this type, barring restoration of a nonconforming use after the nonconforming building is damaged to an extent beyond 50% of the restoration cost, have been upheld as constitutional. See Boward v. County of Cook, 27 Ill. 2d 52, 54-55 (1963). Defendant makes no argument that either the ordinance or section 11--31--1 is unconstitutional. In her petition for rehearing, defendant observes our remark that she makes no constitutionality argument, and she adds that section "11--31--1 as construed [in this opinion] is unconstitutional." However, aside from her argument disputing our interpretation of the ordinance and section 11--31--1, and her statement that property rights are at issue, she offers no constitutional analysis for us to address.

Indeed, a decision cited in the trial court's written opinion (for the proposition that there is "an interplay" between plaintiff's ordinance and the statute) appears to follow the very approach we outline above. In City of Countryside v. Oak Park National Bank, 78 Ill. App. 2d 313 (1966), the plaintiff brought "an action for leave to demolish defendants' building on the ground that it was in an unsafe and dangerous condition." City of Countryside, 78 Ill. App. 2d at 313. At trial, the plaintiff presented a zoning ordinance with the same effect as the ordinance at issue in this case. See City of Countryside, 78 Ill. App. 2d at 315 (quoting ordinance). The defendants challenged only the appraisal of the building, and the appellate court rejected that challenge before holding that "[t]he uncontroverted evidence supports the court's finding that the defendants' building had deteriorated more than fifty per cent of its replacement cost, and its demolition was therefore properly allowed." City of Countryside, 78 Ill. App. 2d at 316. Defendant argues that we should not follow City of Countryside because, since the decision does not quote or cite section 11--31--1, it is "not clear" that the decision actually involved section 11--31--1. However, given the decision's statement that it came about as a result of the plaintiff bringing an action for "leave to demolish" a building "on the ground that it was in an unsafe and dangerous condition," and given that the defendants sought to repair the building, we share the trial court's inference that the decision was based on section 11--31--1. City of Countryside, 78 Ill. App. 2d at 313. Defendant also argues that City of Countryside is of limited precedential value because it has not been cited often and because it was not mentioned in City of Aurora, which was decided shortly after City of Countryside. However, we do not view the fact that a case has been seldom cited as detracting from its persuasive force, and for the reasons stated above, we do not view the approach taken in City of Coutryside as contradicting City of Aurora such that City of Aurora would have had occasion to refer to it. In any event, regardless of the validity of

defendant's criticisms of City of Countryside, we independently come to the same reasoning that appears to have supported its analysis.[8] Here, as in City of Countryside, because the damage exceeded the ordinance's 50% standard, repairs were forbidden and thus not reasonable.[9] See also City of Chicago v. James E. Mulligan Enterprises, Inc., 27 Ill. App. 2d 481, 490 (1960) (in a demolition action under a previous version of the law at issue here, similar law banning repairs on buildings more than 50% destroyed "offer[ed] additional support for the legislative intention as to the city's power to take action with respect to" the building at issue).

---

[8]Defendant overlooks the remainder of our analysis when she argues in her petition for rehearing that our reliance on City of Countryside is the "thinnest of reeds" yet "all there is to support" our decision.

[9]Because we reject defendant's argument and hold that, due to the ordinance, no repairs whatsoever would have been reasonable, we do not reach defendant's argument that the trial court's finding regarding the cost of repair improperly included complete restoration of the building, rather than repairs only of those conditions that rendered the building dangerous and unsafe under section 11--31--1. It is quite true that the typical "reasonableness" test applied in section 11--31--1 cases compares the cost of repairing only the dangerous conditions in a building (as opposed to the cost of repairing all damage in a building) to the value of the building. However, the ordinance, which we conclude controls the reasonableness question here, compares the overall damage to the building (dangerous or not) to the overall cost of the aboveground portion of the building. Because we rely on the ordinance, we need not distinguish the costs of repairing dangerous and other conditions in the building.

Defendant's third argument is that the trial court's demolition order must be vacated because there is insufficient evidence that plaintiff complied with the Code's requirement that an application for a demolition order be filed "if the owner or owners of the building, including the lien holders of record, after at least 15 days' written notice by mail to do so, have failed to put the building in a safe condition or to demolish it." 65 ILCS 5/11--31--1(a) (West 2006). On this point, defendant first asserts that there was no evidence that any notice was mailed to her, because the trial court admitted copies of the notice letters only for, as defendant puts it, "the limited purpose of establishing that a notice was sent by Plaintiff and received by Defendant." Defendant interprets this ruling as allowing the evidence to establish only "that sheets of paper were sent to Defendant," without any indication of what was written on those sheets of paper. Defendant misunderstands the trial court's ruling. As we state above in our recitation of the facts, the trial court allowed the letters to be admitted into evidence to demonstrate that they were sent, but not for the purpose of establishing the truth of the matters asserted therein. Thus, the letters were not evidence that the building was unsafe and required demolition (as the letters claimed), but they were evidence that plaintiff told defendant the building was unsafe and required demolition.

Defendant's second objection to the notice is that it was deficient for failing to apprise her of a right to repair (the notice told her that demolition was required). However, we conclude that the failure to mention a right to repair cannot affect the outcome of this case under the facts presented. For the reasons explained above, we conclude that plaintiff's ordinance barred defendant from repairing her building. Although a court generally may not read unstated limitations into statutes, it also must interpret statutes so as to avoid absurd results. People v. Hanna, 207 Ill. 2d 486, 498 (2003) ("where a plain or literal reading of a statute produces absurd results, the literal reading should

yield"). Thus, although the statute (and case law) literally says that notice of a right to repair is required (and, as explained in Stokovich, is an important reason the statute is constitutional (see Stokovich, 211 Ill. 2d at 130)), we cannot interpret that rule as extending to cases where, for reasons extrinsic to section 11--31--1 itself, there is in fact no right to repair.[10] It would be strange indeed to interpret the statute as requiring a municipality to tell a homeowner falsely that she has a right to repair before the municipality pursues a demolition action, and we will not lend section 11--31--1 such a construction. We therefore reject defendant's argument that plaintiff's notice was deficient for failing to apprise her of a right to repair.[11] Aside from the evidentiary argument we reject above, defendant makes no argument that she was not given notice of plaintiff's intention to seek demolition of the building. Accordingly, we reject defendant's argument that the notice given her was deficient.

---

[10]We do not now hold that notice is unnecessary if it is later determined that there is no right to repair because repair is too costly and thus not reasonable under the test articulated in Stokovich.

[11]In her petition for rehearing, defendant argues that our approach allows a municipality to "presume[] the outcome of the trial," i.e., to forgo notice of a right to repair, and have the omission validated if it later shows at trial that an ordinance restricts repair. However, the fact that the ordinance and statutory issues were combined in this case does not mean that they must be; certainly, the arguments could be considered separately. Indeed, although the municipality here was vindicated in its assertion that defendant had no right to repair, its failure to provide notice carried a risk. If it had been wrong, its failure to provide notice would not have been excused. Further, notice of a right to repair that a municipality opposes could lead to but one result: the owner attempting to exercise the right to repair would meet opposition from the municipality, and the matter would have to be resolved before the repairs could go forward.

Defendant's final objection is that, even if she was given adequate notice, there is no evidence that notice was given to any lienholders of record, as contemplated by section 11--31--1. As with defendant's claim regarding the deficiency in the notice to her, we conclude that, to the extent there are any lienholders of record, notice to them of an illusory right to repair was unnecessary. That leaves only the argument that plaintiff did not give lienholders adequate notice of its intent to pursue demolition of the building.

Plaintiff does not directly address this issue in its appellate brief, other than to argue that notice generally is not a statutory prerequisite to a municipality's proceeding under section 11--31--1. Plaintiff is correct that several appellate court decisions have held that the notice requirements contained in section 11--31--1(a) (or its prior versions) are not prerequisites to the demolition suit described in that section. See City of Chicago v. General Realty Corp., 133 Ill. App. 2d 662 (1971); City of Danville v. Hartley, 101 Ill. App. 2d 31 (1968); James E. Mulligan Enterprises, Inc., 27 Ill. App. 2d 481. However, the holdings in those cases were all based on the notion that the statutory purpose underlying the notice provision was served under the facts presented, because the parties that would have received statutory notice were apprised of the municipalities' intentions to demolish the buildings at issue via their participation in or knowledge of the demolition suits. General Realty Corp., 133 Ill. App. 2d at 670 ("Jones had notice of the proceedings since August 1, 1968, and the demolition order was not entered until February 28, 1969 ***. Jones had much more than the minimum fifteen days"); City of Danville, 101 Ill. App. 2d at 34 ("it is obvious that the continuing litigation has served the function of the notice and that, under the facts and circumstances here, the notice is not a condition precedent to further proceedings"); James E. Mulligan Enterprises, Inc., 27 Ill. App. 2d at 488 ("The statute does not say that notice is a condition precedent to suit," and fact

that the owner was aware of the suit gave her the requisite notice of the city's intentions). Here, there is no indication in the record that any lienholders were given either the statutory notice or notice of this action. Indeed, the issue of lienholders was not addressed below, and although the testimony implies that defendant had a mortgage on her property (she referred to dealings with a bank with an apparent interest in the property), the record contains no definitive statement that a lienholder actually existed at the time of the hearing.

Although the state of the record might normally be cause for our deeming defendant's argument forfeited, we do not do so in this case for two reasons. First, the rights at stake here are those of the potential lienholder; defendant is in no position to forfeit them without the lienholder's notice. Second, in its brief, plaintiff neither argues forfeiture nor contests defendant's assertions that there was a lienholder and that the lienholder received no notice.

Further, we cannot overlook the purported failure to provide notice (either via the statutory notice or via notice or involvement in this action) to a lienholder. Section 11--31--1's legislative history teaches that the statute's inclusion of lienholders among those who must receive notice of a section 11--31--1(a) proceeding was no accident. Prior to 1971, section 11--31--1(a) required notice only to "owners"; the section was amended (Pub. Act 77--1416, §1, eff. September 1, 1971) to state explicitly that notice should be given to "owners, including the lien holders of record." (Emphasis added.) Compare Ill. Rev. Stat. 1971, ch. 24, par. 11--31--1 with Ill. Rev. Stat. 1967, ch. 24, par. 11--31--1. Thus, we must conclude that the legislature very intentionally provided that notice should be given to lienholders.

There is good reason the legislature would have acted to require notice to lienholders of an action to demolish a building. The purpose of the notice requirement--to allow time to repair or

demolish a building prior to the municipality's obtaining a court order requiring repair or demolition (James E. Mulligan Enterprises, Inc., 27 Ill. App. 2d at 488)--is served by requiring notice to lienholders who the statute contemplates might facilitate the repair or demolition. See 65 ILCS 5/11--31--1(a) (West 2006) ("The cost of the demolition [or] repair *** incurred by the municipality, by an intervenor, or by a lien holder of record *** is recoverable from the owner or owners of the real estate").

As important, such a lienholder unquestionably has an interest in the outcome of demolition proceedings, both because of its interest, as a lienholder, in the building's continued existence (so that the building may continue to secure the obligation), and because section 11--31--1 contemplates the subordination of all prior liens to a new lien in favor of the municipality for the cost of any demolition or repair conducted by the municipality. See 65 ILCS 5/11--31--1(a) (West 2006) ("the lien is superior to all prior existing liens and encumbrances"); cf. First of America Bank, Rockford v. Netsch, 166 Ill. 2d 165, 185 (1995) ("liens are property rights entitled to constitutional protection," and thus law creating a prior lien retroactively, and impairing the value of the lien, would unconstitutionally impair lienholder's substantial rights); In re Application of Busse, 124 Ill. App. 3d 433, 441 (1984) ("A mortgagee has a right to his security unimpaired and therefore may maintain an action before breach of condition to recover damages in the nature of waste against the mortgagor or a third person for substantial damages done by him to the mortgaged property, even though in its damaged condition it is of sufficient value to satisfy the mortgage"). Thus, a lienholder in this situation has the type of "substantial property interest" that may not be curtailed without due process of law, including proper notice. Cf. Mennonite Board of Missions v. Adams, 462 U.S. 791, 798, 77 L. Ed. 2d 180, 187, 103 S. Ct. 2706, 2711 (1983) (mortgagee has a substantial property interest that

is "immediately and drastically diminished" by a tax sale of the mortgaged property, which sale could subordinate or avoid the mortgagee's lien, and thus due process requires proper notice). The notice provision of section 11--31--1 serves not only the purpose of helping to facilitate remediation of dangerous structures, but also that of codifying the right to notice (and the right to be heard) afforded by procedural due process to a lienholder whose lien may become subordinate, or severely diminished, when a court orders that the building securing the lien be demolished. Accordingly, we conclude that, even if the notice provision of section 11--31--1(a) allows the filing of a demolition action without notice to owners and lienholders, it does require that the owners and lienholders receive notice (either via notice of the litigation or otherwise) prior to the trial court's entry of a demolition order.

Here, as we say above, the record does not reveal whether proper notice was given to any lienholders, but plaintiff does not dispute defendant's assertion that it was not. We conclude based on the above discussion that section 11--31--1(a) requires proper notice to lienholders prior to any demolition order. We must therefore vacate the trial court's demolition order and remand for the trial court to determine whether there are, indeed, any lienholders, and, if so, whether they were notified. If there was no deficiency in notification, the trial court may reenter its demolition order for the reasons stated herein. If there was inadequate notice to a lienholder, the trial court must ensure proper notice and hear the lienholder's objections, if any, before entering (or declining to enter) a demolition order.[12]

---

[12]In her petition for rehearing, defendant argues that any failure to involve a lienholder in this litigation should render the judgment void and require a retrial. Thus, defendant asks that we now so order. This argument, however, is one the parties (and lienholder, if applicable) may raise below,

For the foregoing reasons, we vacate the judgment of the circuit court of McHenry County and remand for further proceedings.

Vacated and remanded with directions.

JORGENSEN and HUDSON, JJ., concur.

---

after the trial court has determined the extent to which any interested lienholder was deprived of notice; we express no opinion on the issue now.